# United States Court of Appeals

*for the*

# Third Circuit

Case No. 16-3405

UNITED STATES OF AMERICA

– v. –

JOHN A. BENNETT,

*Appellant.*

ON APPEAL FROM AN ORDER ENTERED IN THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF NEW JERSEY IN CASE NO. 2:09-CR-00656-002
HONORABLE SUSAN D. WIGENTON

## BRIEF FOR DEFENDANT-APPELLANT AND APPENDIX
### Volume 1 of 3 (Pages A-1 to A-16)

RICHARD F. ALBERT
ROBERT J. ANELLO
BRIAN A. JACOBS
PETER A. JANOWSKI
JOCELYN C. KAOUTZANIS
JACOB W. MERMELSTEIN
MORVILLE ABRAMOWITZ GRAND IASON
   & ANELLO PC
565 Fifth Avenue
New York, New York 10017
(212) 856-9600

*Attorneys for Defendant-Appellant*

# **TABLE OF CONTENTS**

JURISDICTIONAL STATEMENT ...........................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ....................................1

STATEMENT OF RELATED CASES AND PROCEEDINGS ...........................3

STATEMENT OF CASE ......................................................................5

STATEMENT OF FACTS ....................................................................8

I.    Mr. Bennett's Trial ....................................................................8

    A.    The Government's Case .......................................................8

        1.    BEI and the Federal Creosote Superfund Site ............................8

        2.    The Phase I Contract ................................................11

        3.    The Phase II Contract ...............................................11

        4.    The Phase III Contracts .............................................14

        5.    The BEI Purchase Orders ..........................................16

        6.    The Government's Reliance on Robert Griffiths...................17

    B.    The Defense Case .............................................................20

    C.    The Verdict .....................................................................26

II.   The Post-Trial Motions ..............................................................26

III.  John Bennett's Sentencing...........................................................26

SUMMARY OF ARGUMENT .............................................................26

ARGUMENT ....................................................................................30

I.    The District Court Erred In Denying Mr. Bennett's Rule 29
      Motion Because the Evidence Failed to Show that He Knew of
      Material Misrepresentations, Acted with Fraudulent Intent, or
      Acted with Intent to Pay Unlawful Kickbacks To Get Favorable
      Treatment ................................................................................................30

      A.    Standard of Review ...........................................................................30

      B.    The District Court Erred In Denying Mr. Bennett's Rule
            29 Motion On Count Two Because the Government Did
            Not Introduce Any Proof Whatsoever that Mr. Bennett
            Knew of Any Material Misrepresentations, and Because
            the Proof Affirmatively Showed the Absence of Intent to
            Defraud ...............................................................................................30

            1.    Applicable Law ........................................................................30

            2.    Discussion ................................................................................32

                  a.    The Government Failed To Prove Beyond A
                        Reasonable Doubt That Mr. Bennett Knew of
                        Any Material Misrepresentation in
                        Connection with the Phase II Bidding .............................32

                  b.    The Government Failed To Prove Beyond A
                        Reasonable Doubt That John Bennett Acted
                        With Specific Intent To Defraud in
                        Connection with the Phase II Bidding
                        Because BEI's Bid Remained the Same
                        Before and After Griffiths Entered Into an
                        Agreement with McDonald to Pay Kickbacks..................36

      C.    The District Court Erred In Denying Mr. Bennett's Rule
            29 Motion On Count One...................................................................40

            1.    The Government Failed To Prove The Major
                  Fraud Object Beyond A Reasonable Doubt
                  Because the Evidence Failed To Show Material
                  Misrepresentations or Intent To Defraud....................................40

2. The Government Failed To Prove The Anti-Kickback Object Beyond A Reasonable Doubt Because the Evidence Failed To Prove Intent to Obtain Favorable Treatment Improperly ...................................41

II. The District Court Erred By Allowing a Government Lay Witness to Offer Materially Inaccurate and Highly Prejudicial Testimony Concerning the Application of Technical Regulations and Mr. Bennett's State of Mind ...............................44

    A. Standard of Review .............................................................45

    B. Relevant Facts .....................................................................45

    C. Discussion ...........................................................................50

III. The District Court Abused Its Discretion By Admitting Unreliable Telephone Records Despite Indications That Some Phone Records Had Been Doctored ...............................................57

    A. Standard of Review .............................................................57

    B. Relevant Facts .....................................................................58

    C. Discussion ...........................................................................60

IV. The District Court Abused Its Discretion When It Denied Mr. Bennett's Mistrial Motion Based On Comments By The Government In Its Summations ....................................................63

    A. Standard of Review .............................................................63

    B. Discussion ...........................................................................63

V. The District Court's Instruction on the Anti-Kickback Act Was Erroneous and Prejudicial ...............................................................68

    A. Standard of Review .............................................................68

    B. Discussion ...........................................................................68

VI.     The Cumulative Effect of the District Court's Errors Warrants
         Reversal ........................................................................................73

VII.    Mr. Bennett's Sentence Was Procedurally and Substantively
         Unreasonable .................................................................................74

CONCLUSION ...................................................................................77

# Table of Authorities

## Cases

*Chiarella v. United States*, 445 U.S. 222 (1980) .....................................31

*Koon v. United States*, 518 U.S. 81 (1996)............................................45

*McDonnell v. United States*, 136 S. Ct. 2355 (2016) ...........................69, 70, 71, 72

*Neder v. United States*, 527 U.S. 1 (1999)....................................31, 32, 72

*United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*,
    822 F.3d 650 (2d Cir. 2016) ...................................................32, 34

*United States v. Anderskow*, 88 F.3d 245 (3d Cir. 1996) .......................................53

*United States v. Bailey*, 581 F.2d 341 (3d Cir. 1978).............................................62

*United States v. Baskes*, 649 F.2d 471 (7th Cir. 1980).....................................52, 56

*United States v. Beros*, 833 F.2d 455 (3d Cir. 1987)..............................................68

*United States v. Berrios*, 676 F.3d 118 (3d Cir. 2012) ...........................................30

*United States v. Brennan*, 326 F.3d 176 (3d Cir. 2003) ..........................................63

*United States v. Brodie*, 403 F.3d 123 (3d Cir. 2005) ............................................35

*United States v. Cannon*, 88 F.3d 1495 (8th Cir. 1996) ..........................................65

*United States v. Caraballo-Rodriguez*, 726 F.3d 418 (3d Cir. 2013).....................30

*United States v. Certified Envtl. Svs. Inc.*, 753 F.3d 72 (2d Cir. 2014).............73, 74

*United States v. Cimera*, 459 F.3d 452 (3d Cir. 2006) ...........................................63

*United States v. Dreer,* 740 F.2d 18 (11th Cir. 1984)  ...........................................61

*United States v. Fenzl*, 670 F.3d 778 (7th Cir. 2012) ...............................................56

*United States v. Fischbach & Moore, Inc.*, 750 F.2d 1183 (3d Cir. 1984) .............68

*United States v. Furst*, 918 F.2d 400 (3d Cir. 1990) .........................................75, 76

*United States v. Gambone*, 314 F.3d 163 (3d Cir. 2003)........................................30

*United States v. Gee*, 226 F.3d 885 (7th Cir. 2000)..........................................35, 36

*United States v. Georgiou*, 777 F.3d 125 (3d Cir. 2015)........................................45

*United States v. Gole*, 158 F.3d 166 (2d Cir. 1998) ..............................................37

*United States v. Griffiths*, 504 F. App'x 122 (3d Cir. 2012) ....................................4

*United States v. Higdon*, 638 F.3d 233 (3d Cir. 2011) ...........................................57

*United States v. Hill*, 976 F.2d 132 (3d Cir. 1992)................................................73

*United States v. Hodge*, 150 F.3d 1148 (9th Cir. 1998) .........................................36

*United States v. Johns*, 742 F. Supp. 196 (E.D. Pa. 1990) .....................................39

*United States v. Johnson*, 231 F.3d 43 (D.C. Cir. 2000) ........................................65

*United States v. Mastrangelo*, 172 F.3d 288 (3d Cir. 1999)...................................64

*United States v. Meises*, 645 F.3d 5 (1st Cir. 2011) ...............................................56

*United States v. Modica*, 663 F.2d 1173 (2d Cir. 1981) ...................................64, 65

*United States v. Munchak*, 527 F. App'x 191 (3d Cir. 2013) .................................76

*United States v. Newman*, 773 F.3d 438 (2d Cir. 2014) .........................................71

*United States v. Polishan*, 336 F.3d 234 (3d Cir. 2003)...................................53, 54

*United States v. Rea*, 958 F.2d 1206 (2d Cir. 1992).........................................52, 53

*United States v. Riddle*, 103 F.3d 423 (5th Cir. 1997)..........................51, 56, 57, 74

*United States v. Rivera*, 900 F.2d 1462 (10th Cir 1990) .........................................73

*United States v. Rybicki*, 354 F.3d 124 (2d Cir. 2003) ............................................31

*United States v. Schiff*, 602 F.3d 152 (3d Cir. 2010) ...............................................45

*United States v. Schneider*, 801 F.3d 186 (3d Cir. 2015) ...........................45, 57, 63

*United States v. Solivan*, 937 F.2d 1146 (6th Cir. 1991) ............................65, 66, 67

*United States v. Stadtmauer*, 620 F.3d 238 (3d Cir. 2010)................................52, 53

*United States v. Stalnaker*, 571 F.3d 428 (5th Cir. 2009).......................................31

*United States v. Stoerr*, 695 F.3d 271 (3d Cir. 2012) .................................................4

*United States v. Valentine*, 820 F.2d 565 (2d Cir. 1987)........................................67

*United States v. Vega*, 813 F.3d 386 (1st Cir. 2013) ...............................................51

*United States v. White*, 492 F.3d 380 (6th Cir. 2007)..............................................51

*United States v. Wilson*, 281 F. App'x 96 (3d Cir. 2008).......................................62

*United States v. Wright*, 363 F.3d 237 (3d Cir. 2004) ............................................62

*United States v. Zauber*, 857 F.2d 137 (3d Cir. 1988)............................................39

## Statutes, Rules, and Other Authorities

18 U.S.C. § 371 ............................................................................................................6

18 U.S.C. § 1031 ............................................................................................6, 7, 30, 31

18 U.S.C. § 1343 ......................................................................................................6, 7

18 U.S.C. § 3231 ..........................................................................................................1

18 U.S.C. § 3505 .................................................................................58, 59, 60, 61

28 U.S.C. § 1291 ...........................................................................................................1

41 U.S.C § 53 .................................................................................................................6

41 U.S.C § 54 .................................................................................................................6

41 U.S.C. § 8701 ..............................................................................6, 41, 53, 69

Federal Acquisition Regulation 52.203-7(a) ..........................................................53

Federal Rule of Evidence 701 ..........................................................................*passim*

Federal Rule of Evidence 807 ..............................................................28, 59, 61, 62

Federal Rule of Evidence 901 ........................................................................59, 61

H.R. REP. 99-964, 1986 U.S.C.C.A.N. 5960 (Oct. 3, 1986) ...................................69

U.S.S.G. App'x C, Amendment 794 ........................................................................75

U.S.S.G. § 3B1 ............................................................................................................75

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction over this conspiracy and major fraud prosecution under 18 U.S.C. § 3231. It entered judgment on August 12, 2016, and Defendant John Bennett filed a timely notice of appeal on August 16, 2016. The District Court entered an amended judgment on August 17, 2016, and Mr. Bennett filed a timely amended notice of appeal on August 30, 2016. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

(1) Whether the government presented sufficient evidence to support the jury's verdict when it failed to offer evidence that Mr. Bennett made or knew of any material misrepresentation or acted with fraudulent intent, or intentionally paid kickbacks to obtain favorable treatment. At the close of both the government's case and all the evidence, Mr. Bennett moved for a judgment of acquittal on this ground. (A-552, 582.2-584, 810.1-2, 883.1).[1] Each time, the District Court reserved decision. (A-588, 883.1). Mr. Bennett renewed those motions in post-trial briefing. (Docket Entries 363, 373, 375). The District Court denied the motions on July 20, 2016. (Docket Entry 379).

---

[1] "A" refers to the appendix filed with this brief; "GX" refers to a government exhibit at Mr. Bennett's trial; "D" refers to a defense exhibit at trial; "[DATE] Tr." refers to the trial transcript for the specified date; and "Docket Entry" refers to an entry on the District Court's docket for this case, 09-CR-656 (D.N.J.).

(2) Whether the District Court erred in permitting a government lay witness to offer materially inaccurate testimony concerning the application of technical laws and regulations and Mr. Bennett's state of mind, without being noticed or qualified as an expert. Mr. Bennett objected throughout the testimony. (A-410-412, 437, 439-442, 446, 454, 459, 461, 465-468). Mr. Bennett also sought a new trial based on this improper testimony in a post-trial motion. (Docket Entry 363). The District Court overruled each objection and denied the post-trial motion on July 20, 2016 (Docket Entry 379).

(3) Whether the District Court erred in admitting multiple exhibits containing telephone records without a witness to authenticate them, after a telephone company employee advised the government that some such records were likely falsified. Mr. Bennett objected to these records in a letter brief (A-358), and renewed that objection at trial. (A-407.2-5, 546-547). The District Court overruled Mr. Bennett's objections and admitted the records. (A-408-410).

(4) Whether improper remarks in the government's summations, including remarks that improperly invited the jury to convict Mr. Bennett because he was not an American, require reversal of his conviction. Mr. Bennett objected and moved for a mistrial at the close of both the government's main and rebuttal summations. (A-849-850, 854-856, 873-878). The District Court denied the motions. (A-850-851, 856, 878). Mr. Bennett also sought a new trial in a post-trial motion. (Docket

Entry 363). The District Court denied that motion on July 20, 2016. (Docket Entry 379).

(5) Whether the District Court's jury instructions on the elements of the applicable anti-kickback statute were legally incorrect and prejudicial by failing to include any limit to prevent the jury from convicting based on innocent or incidental favors or even absent a request for specific favorable treatment in return. Mr. Bennett objected to this instruction both in written proposed jury instructions. (A-733, 757-758), as well as during the charge conference. (A-726-729). Mr. Bennett also made a post-trial motion on this basis, which the District Court denied. (Docket Entry 379).

(6) Whether the cumulative effect of the District Court's errors requires reversal where evidence of guilt was far from overwhelming.

(7) Whether the sentence of Mr. Bennett, an 80-year old first-time offender with an unblemished record, a long history of social good works, and serious medical issues, is procedurally and substantively unreasonable.

## STATEMENT OF RELATED CASES AND PROCEEDINGS

On March 17, 2016, Mr. Bennett appealed the District Court's order denying bail pending sentencing. (No. 16-1581). This Court affirmed the order on April 13, 2016.

3

One of Mr. Bennett's co-defendants, Gordon McDonald, was convicted after trial. McDonald appealed his conviction and sentence and this Court affirmed. (No. 14-1587).

Mr. Bennett's other co-defendant, James Haas, pleaded guilty on October 28, 2009.

The following additional defendants pleaded guilty to related charges in the District of New Jersey:  JMJ Environmental Inc. and John Drimak, Jr. (08-CR-522); National Industrial Supply and Victor Boski (09-CR-141); Zul Tejpar (08-CR-912); Robert Griffiths (09-CR-506); Bennett Environmental, Inc. (08-CR-534); Christopher Tranchina (09-CR-134); Frederick Landgraber (09-CR-480); and Norman Stoerr (08-CR-521).

Griffiths appealed from his sentence, and this Court vacated his sentence and remanded for resentencing. *See United States v. Griffiths*, 504 F. App'x 122 (3d Cir. 2012). On remand, Griffiths was resentenced.

Non-party Sevenson Environmental Services Inc. appealed from the judgment against Stoerr, challenging the District Court's restitution order. This Court held that it lacked jurisdiction. *United States v. Stoerr*, 695 F.3d 271 (3d Cir. 2012). Sevenson also instituted a civil action in the District of New Jersey against Mr. Bennett, Stoerr, McDonald, and others. *See Sevenson Environmental Services, Inc. v. McDonald, et al.* (No. 08-CV-1386). The action was voluntarily dismissed

4

as to Mr. Bennett on February 11, 2015, but remains pending as to other defendants.

## STATEMENT OF CASE

This case concerns an eighty-year-old man, John Bennett, who grew up in Wales in the depths of the Depression and World War II, and who became a tremendously successful engineer and entrepreneur. Over the course of a thirty-five-year career—during which Mr. Bennett started four companies from scratch and obtained 17 patents—Mr. Bennett took on some of the most difficult environmental cleanup projects in the world, including the Santa Barbara and Exxon Valdez oil spills, and environmental disasters in the Baltic and South China Seas. This case arises out of the work Mr. Bennett's company, Bennett Environmental Inc. ("BEI"), successfully performed at the Federal Creosote Superfund site in Manville, New Jersey, from late 2001 until August 2004, involving environmental remediation of soil contaminated with toxic hydrocarbons such as PCBs and PCPs.

During the years after BEI's work at the site, the Department of Justice's Antitrust Division investigated BEI, but no antitrust case was ever brought. Unwilling to close the investigation without charges, however, the Antitrust Division prosecutors resorted to alleging that Mr. Bennett and others committed fraud and paid unlawful kickbacks. As set forth in more detail below, the

government's theories of prosecution were fatally flawed. Among other things, the evidence failed to establish any material misrepresentations, any intent to defraud, or any improper kickbacks. Instead, the evidence at trial supported Mr. Bennett's defenses that key aspects of the charged conspiracy were hidden from him by his supposed co-conspirators and that BEI had no reason to pay bribes as it was the only company that could do the job.

In the end, this case has left an 80-year man—who devoted his life to environmental clean-up—serving an effective life sentence based on insufficient evidence and severe trial errors. This Court must reverse.

Indictment 09 Cr. 656 (SDW) (the "Indictment") (A-38) was filed on August 31, 2009, charging John Bennett.[2] Count One charged him with participating in a conspiracy, in violation of Title 18, United States Code, Section 371, from December 2001 through August 2004, with three unlawful objects: (1) to provide kickbacks to a prime contractor to improperly obtain or reward favorable treatment, in violation of Title 41, United States Code, Sections 53 and 54 (the "Anti-Kickback Act")[3]; (2) to commit major fraud against the United States, namely the Environmental Protection Agency (the "EPA"), in violation of Title 18,

---

[2] The Indictment also charged two other defendants with some of the same counts and other, additional counts involving unrelated matters.

[3] In 2011 Congress re-codified the Anti-Kickback Act without substantive change, placing it at 41 U.S.C. §§ 8701, *et seq.*

United States Code, Section 1031; and (3) to commit wire fraud, in violation of Title 18, United States Code, Section 1343. Count Two charged Mr. Bennett with committing major fraud against the United States on May 15, 2002, in violation of Title 18, United States Code, Section 1031(a).

A jury trial against John Bennett commenced on February 22, 2016,[4] before the Honorable Susan D. Wigenton, United States District Judge for the District of New Jersey, and concluded on March 16, 2016, when the jury found Mr. Bennett guilty of both counts. With respect to Count One, the jury indicated that it found that the government had established the first and second alleged objects of the conspiracy (kickbacks and major fraud), but not the third object (wire fraud).

On April 22, 2016, Mr. Bennett filed a motion for acquittal on all counts under Rule 29 of the Federal Rules of Criminal Procedure, or for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. On July 20, 2016, the District Court denied Mr. Bennett's motions.

On August 9, 2016, Mr. Bennett was sentenced to 60 months' imprisonment on Count I, and 63 months' imprisonment on Count II, to run concurrently, a $12,500 fine, restitution of $3,808,065.72, and two years of supervised release. Mr. Bennett is currently serving his sentence.

---

[4] The jury was selected the week before beginning on February 17, 2016.

## STATEMENT OF FACTS

### I.   Mr. Bennett's Trial

#### A.   The Government's Case

##### 1.   BEI and the Federal Creosote Superfund Site

In 1992, John Bennett formed BEI to treat contaminated soil using a state-of-the-art proprietary thermal treatment process that he developed and refined. Mr. Bennett had spent his entire career in the environmental cleanup industry. He had 17 patents for technologies he invented for cleaning oil spills on land and at sea. (A-638.1). With BEI, Mr. Bennett turned his attention to removing some of the world's most hazardous chemicals—PCBs and PCPs—from contaminated soil. Mr. Bennett served as CEO of the company until February 2004. One of the dozens of environmental remediation projects BEI worked on was the Federal Creosote Superfund site in Manville, New Jersey. (A-918-920).

From approximately 1910 through 1950, the Manville site became contaminated with creosote, a wood preservative that causes skin irritation and respiratory problems. In the late 1990s, the EPA contracted with the U.S. Army Corps of Engineers ("Army Corps") to oversee remediation of the site. The Army Corps hired Sevenson Environmental Services Inc. ("Sevenson") as its prime contractor, and Sevenson hired multiple subcontractors, including BEI, to perform remediation work. (A-119).

Prior to the commencement of work at the site, BEI met with the EPA to explain BEI's capabilities (A-310), and the EPA thereafter issued a Record of Decision specifying the remediation plan for the site. Because of Mr. Bennett's innovative designs for BEI's plant, not all of BEI's competitors had the ability to treat hazardous materials with the same high temperatures or with the same speed that BEI could. The EPA's Record of Decision required high-temperature thermal treatment of the type offered by BEI, and dictated an accelerated schedule, affording BEI an early advantage over its competitors because it required that "everyone had to meet [BEI's] high bar." (A-311).

BEI's work at the site involved transporting thousands of tons of contaminated soil to Canada and treating that soil through high-temperature incineration at the company's plant. (A-295-296). This work was carried out in three phases. For each phase, Sevenson was supposed to gather bids from subcontractors and select a winning bid. BEI's superior design provided additional crucial competitive advantages at Federal Creosote over its potential competitors, including that: BEI's kiln was the only plant in North America designed exclusively to handle contaminated soil in large volumes (A-966; A-526-529); its facility was hundreds of miles closer to Federal Creosote than any competitor (A-973.1; 304, 530); it had no outstanding environmental violations (A-321); and it was the only facility with the storage capacity to accept soil on the EPA's required

9

schedule, which was hastened due to Federal Creosote's location in a residential area (A-966, 526-529). As a result of these advantages, BEI was able to get dirt off of the Federal Creosote site much faster than its competitors, which translated into a significant cost savings to the EPA due to the fixed costs associated with the site. (A-303-304).

In contrast, BEI's competitors had significant disadvantages compared to BEI, including serious financial difficulties (A-318, 533); extensive prior environmental violations (A-319-320); a poor reputation in the industry (A-200, 314-315, 320); and insufficient capacity to complete the work in the time frame required by the EPA. (A-313-322, 529). In the view of the government's witnesses, BEI was "vastly superior to its competitors" (A-307) and "the only company that could do this job" (A-311-312; *see also* A-529, 534 (there were "no other companies that could do this Federal Creosote job nearly as effectively or as efficiently as BEI")). That sentiment also was reflected in emails admitted at trial. (A-923 ("The only way Sevenson can do this project on schedule is to use us")).

For Phases I and II, and for one of the Phase III contracts, the winning bid was supposed to be selected based on which subcontractor provided the "best value," considering the subcontractor's bid price, the subcontractor's technical ability, safety record, and speed with which it could complete the job, and other

factors. (A-122-124, 180, 338, 433-434). BEI's superior design—not just its lower

price—made it the obvious choice of "best value."

## 2.    **The Phase I Contract**

On November 20, 2000, BEI put in a bid for Phase I of the Federal Creosote

project and, in early 2001, BEI was selected as the winning bidder as a result of the

competitiveness of BEI's price and its superior technology. (A-299-300, 348, 471-

472). The evidence at trial showed that Phase I was bid without any impropriety.

(A-341). In December 2001, after BEI had begun its work on Phase I, BEI hosted a

group of Sevenson employees in an executive party suite to watch a hockey game

as a networking event, in the hopes of getting work on a number of other large,

privately-funded jobs that Sevenson was managing. (A-154-155, 252-255, 260).

## 3.    **The Phase II Contract**

On March 4, 2002, Sevenson issued a Request for Proposal ("RFP") for

Phase II of the Federal Creosote site's remediation. (A-901). By this time, a

Sevenson employee named Gordon McDonald was the project manager of the site.

In additional to its significant technical competitive advantages, as the incumbent

subcontractor, BEI had a further advantage over its competitors during Phase II

bidding by virtue of having a better understanding of site conditions and having

built up a track record of successful performance during the first phase of work.

(A-344-345, 352, 451). BEI submitted its initial bid of $498.50 per ton on March

14, 2002, one day before the March 15 deadline for bid submissions, and this bid did not change throughout the Phase II bidding. (A-419-420). In an email sent two days before the March 15 deadline, Peter Richardson, BEI's president, unequivocally said to Robert Griffiths, a BEI employee who testified as a cooperating witness: "we [BEI's management] are all happy with current pricing and we just want you to book it at that price if possible." (A-926). Due to a change in soil specifications and quantity of soil, however, the contract had to be re-bid. (A-348-349).

At some point before the re-bid formally was announced, McDonald informed Griffiths that BEI was not the low bidder for Phase II. (A-158-159, 328). According to Griffiths, he and McDonald then supposedly entered into an agreement whereby, in exchange for BEI making payments to cover certain of Sevenson's expenses, McDonald would provide BEI with information concerning its competitors' bids. (A-161, 164, 170). In particular, after BEI already had submitted its initial bid of $498.50 per ton on March 14, 2002, Griffiths met with McDonald on March 28, 2002, at a Ramada hotel in Manville, New Jersey. (A-163-164, 189). At this meeting, Griffiths and McDonald allegedly agreed that "an amount of $13.50 per ton" would be paid to McDonald, in return for McDonald providing BEI with a "last look" at competitors' bids, which would enable BEI to undercut its competitors' bid prices, if it chose to do so. (A-163-164, 189).

12

After the rebid formally was announced, McDonald told Griffiths on May 6, 2002, that Safety Kleen, BEI's only competitor for this phase, was expected to submit a bid of approximately $400 per ton. Griffiths suggested in an email that if Safety Kleen supposedly came in "at 400 on the nose," it might "be prudent for us to become the low bidder by a dollar or two." (A-923). Notwithstanding this suggestion, on May 15, 2001, BEI submitted a bid of $498.50 per ton, the exact price as BEI's initial bid. (A-419-420). As it turned out, the information that Griffiths claims to have received regarding Safety Kleen's bid was incorrect— Safety Kleen actually bid $520 per ton. (A-907). BEI won the Phase II contract as the best value.[5]

After BEI won the Phase II contract, McDonald explained to Griffiths how BEI should pay the money that was owed for Sevenson's expenses. In June 2002, McDonald asked Griffiths to send wire transfers from BEI to a company called "General Monitoring and Environmental Control, Inc.," or "GMEC," which was a shell company McDonald controlled. (A-193, 376-377). Initially, Griffiths thought that GMEC was a legitimate soil testing company. (A-375-376). Once he learned what GMEC actually was, he hid the truth about the company from John Bennett

---

[5] Even after the bidding on Phase II had concluded, no one at BEI was aware of its competitor's actual bids. On May 16, 2002, one day after BEI submitted its final bid, Griffiths relayed to BEI management—incorrectly—that Safety Kleen's price was $578 per ton. (*See* A-972; 334-335).

and others at BEI by using fake invoices that made it seem like GMEC actually was doing work for BEI. (A-376-378).

Through at least 2015, Griffiths told the government in the course of his cooperation that he hid GMEC's true nature from everyone at BEI, including Mr. Bennett. (A-399-400, 612-614). Shortly after Griffiths learned the true nature of GMEC, McDonald began sharing a portion of GMEC's income with Griffiths. (A-380-381). Zul Tejpar, the other BEI employee who testified as a cooperating witness, did not learn that GMEC was actually a shell company for McDonald until 2007 well after payments ceased and when he found out, it was a "shock" to him. (A-522-523). In addition to wire transfers BEI made to GMEC, Griffiths also provided McDonald, among other things, with a Mediterranean cruise in September 2002, and a plasma television and wine cooler in December 2002. (A-503, 242, 500).

### 4.    The Phase III Contracts

A year later, in June 2003, BEI won the subcontract for Phase III and issued a press release announcing the award. (A-383-384, 391). This prompted Clean Harbors, which had submitted a lower bid than BEI, to protest, arguing that it should have been awarded the contract. (A-207, 210). The Army Corps investigated, and ultimately rebid the contract in late 2003. Again, BEI won.

According to Griffiths, he won the bid for BEI by printing out and submitting over a hundred different bid pricing sheets to McDonald from which McDonald would pick a winning bid after seeing competitors' bids. (A-213). Griffiths also stated that in the early morning hours on the day of the bid opening, he had called Mr. Bennett using one phone and simultaneously called McDonald on another phone to discuss which bid to submit. (A-214-217). Phone records (which were of dubious authenticity, *see* Section III, *infra*, at pp. 57-63) purported to show a single call from Griffiths to Mr. Bennett at 5:40 a.m. EST on December 8, 2003.

On cross-examination, however, Griffiths conceded that he "didn't know who had won" at the time of the bid opening, and that the true reason he failed to attend the bid opening was because he had gotten too drunk the night before. He also acknowledged on cross that his memory of that time period was poor, and conceded that he could not recall whether the 5:40 a.m. call was actually to inform Mr. Bennett that he (Griffiths) could not attend the bid opening, leading Mr. Bennett to become "very angry." (A-387-388). Contrary to Griffiths' story, the phone records admitted by the government actually showed that Griffiths never was simultaneously on the phone with McDonald and Mr. Bennett. (A-941, 951).

### 5.    **The BEI Purchase Orders**

For each of the bids BEI won, Griffiths signed a purchase order with the Army Corps (A-143-144; *see*, *e.g.*, A-889, 895), and he showed the purchase orders for Phase I and Phase II to Mr. Bennett, who had given Griffiths permission to sign on behalf of BEI. (A-150-151, 185-186). The Phase II purchase order contained a certification stating that BEI would "furnish all requirements to perform and complete the following, all in strict compliance with the principal contract documents for the above referenced project." (A-895). The Phase I purchase order contained a similar certification referencing the "prime contract documents." (A-889).

The references to "prime contract documents" and "principal contract documents" in the Phase I and Phase II contracts, respectively, according to Griffiths and another witness, Mari Shannon from the Army Corps, were references to Sevenson's prime contract with the Army Corps. (A-145, 449). Although the government introduced copies of the prime contract documents into evidence at trial (GX 3a through 4c; A-146), and although those documents included a requirement that Sevenson and its subcontractors comply with the Anti-Kickback Act (A-885-886; 457), the evidence demonstrated that BEI never received a copy of the prime contract documents from Sevenson or anyone else. (A-148, 324-325, 462).

16

### 6.    The Government's Reliance on Robert Griffiths

In presenting its case, the government relied heavily on the testimony of Robert Griffiths, a deeply troubled individual with a pathological history of fabrication, including fabrication under oath. As the principal BEI employee responsible for the Federal Creosote site, Griffiths served as the main conduit of information between McDonald and BEI (A-480), and was the only witness capable of supporting key portions of the government's case. For example, Griffiths was the only government witness who purported to have first-hand knowledge of allegedly illicit conversations between Mr. Bennett and McDonald (A-512), and the only witness to suggest that bid-rigging was discussed in the early-morning call between Griffiths and Mr. Bennett on December 8, 2003 (A-214-217). Griffiths was also the only witness to testify that a quid pro quo demand was articulated by McDonald. (A-161-166).

Crucially, Griffiths also was the only witness who knew during the charged conspiracy that GMEC—the company allegedly used to funnel improper payments to Gordon McDonald—was actually a sham controlled by McDonald, not a bona fide soil testing company. (A-194, 522-523, 540). By testifying that he told Mr. Bennett the true nature of GMEC, Griffiths linked Mr. Bennett to the heart of the

government's case in a way no other witness did, or could have done.[6] The

government relied upon Griffiths alone to establish that Mr. Bennett received a

copy of the purchase order containing the language on which the government's

fraud theory was based (A-150, 185-186).

Notwithstanding the centrality of Griffiths' testimony to the government's

case, Griffiths' suffered from a grave lack of credibility based on his history of

duplicity, the dramatic shifts in his recollection of pertinent events, and conflicts

between his testimony and documentary evidence. Griffiths previously had lied

under oath in legal proceedings before the Securities and Exchange Commission

and Ontario Securities Commission, lied to his own attorneys, lied to BEI's outside

counsel conducting an internal investigation, and, while working at BEI, routinely

lied to Mr. Bennett, including by creating phony paper trails to disguise his

expenses. He also had engaged in extensive tax fraud (A-230-232, 290-294), ran an

illegal marijuana cultivation operation, engaged in stock manipulation, and

dishonestly transferred property to hide it from creditors. (A-132-133, 393-396).

After agreeing to plead guilty and cooperate, Griffiths' behavior failed to improve:

he has never paid the restitution ordered against him—restitution for which Mr.

---

[6] Although Tejpar initially testified that McDonald was receiving kickbacks via
GMEC, and that GMEC was not providing any services to BEI (A-483-484, 494,
509, 515, 518), that testimony was nullified by his subsequent acknowledgment
that he was not aware of either fact until 2007—several years after he and Mr.
Bennett had left BEI (A-522-523, 540).

Bennett is now jointly and severally responsible—never paid the taxes that he

avoided through fraudulent deductions, and sold real estate in violation of the

District Court's order, mere months after his sentencing. (A-295, 312-313).

Griffiths' testimony in this case was both implausible and in key respects

irreconcilable with earlier statements that he had made under oath or to the

government while cooperating, or was contradicted by documentary evidence. For

instance, Griffiths claimed at trial that he contemporaneously told Mr. Bennett that

McDonald owned GMEC. (A-194). The DOJ's case agent Paul Brezinski

confirmed, however, that even while seeking to cooperate, Griffiths told the DOJ

that he had *never* shared that fact with Mr. Bennett, and that Griffiths only changed

his story in 2015—eleven years after the conspiracy ended. (A-399-400, 612-614).

Griffiths also confirmed that McDonald transmitted the GMEC invoices to

Griffiths solely via Griffiths' private email account so as not to have the

communications accessible on BEI's server, a maneuver that would be unnecessary

if Mr. Bennett already knew McDonald's connection to GMEC. (A-381). At trial,

Griffiths claimed that McDonald explicitly promised to favor BEI in return for

kickback (A-161-166), but Griffiths previously told the government that

McDonald *never* made an explicit quid pro quo demand (A-401-403). Griffiths

also claimed to recall Mr. Bennett specifically directing him to create

pseudonymous online accounts to pump BEI's stock price (A-132-133), but in a

19

deposition one-and-a-half years earlier, Griffiths testified that he had no recollection of whether anyone at BEI even knew that Griffiths had engaged in that activity (A-286-287).

Griffiths' testimony regarding the Phase II bidding was belied by both his own prior statements and documentary evidence. Griffiths said in 2008—seven years closer to the events in question—that he had no recollection of how the $13.50 figure was arrived at. (A-405). Griffiths' belated "recollection" of BEI having initially submitted a bid of $485, and later raising that price to $498.50, is impossible to reconcile with the absence of any bid at that price, or the evidence that BEI bid $498.50 before the alleged conspiracy had even begun. Finally, Griffiths' assertion that Mr. Bennett had agreed to pay for extravagant entertainment expenses to gain favorable treatment at the Federal Creosote site was undermined by scores of contemporaneous emails and expense report records showing that Griffiths routinely sought to justify entertainment expenditures benefitting Sevenson by invoking phony private-sector jobs. (A-234-239, 268-269, 415-416, 970, 935, 971). That elaborate ruse would have been unnecessary if Mr. Bennett had understood and agreed to the charged conspiracy.

## B.     The Defense Case

Mr. Bennett called five witnesses in his defense case and also testified himself. First, Mr. Bennett called Christopher Ryan, who testified as an expert in

the field of environmental industry customs, contracting, and practices. (A-555).

Ryan testified that neither the contracting documents, the federal acquisition

regulations (the "FAR"), nor industry practice required that subcontractor selection

(as opposed to prime contractor selection) be "fair" to all bidders or that all bidders

be treated equally. (A-558-561, 565-566). Rather, the procurement process

approved by the Army Corps authorized the prime contractor, Sevenson, to favor a

subcontractor that they "kn[ew]and love[d]" such as an incumbent with a

successful track record. (A-560). Ryan explained that prime contractors commonly

share information about one competitor's capability or anticipated bid price with

another competitor, and that the practice is considered appropriate in the industry

except in rare instances where sealed bidding is used. (A-561-564). Ryan also

testified that "last looks" at a competitor's bid like those Griffiths claimed to

receive from McDonald constitute a standard industry practice designed to induce

a preferred subcontractor to lower its price. (A-125, 568-570, 573).

Mr. Bennett next called Sonia Shoukry, a former BEI employee. (A-576).

Shoukry explained the history of BEI and Mr. Bennett's role in forming the

company, and testified about Mr. Bennett's integrity and the handicaps that he

overcame at work. (A-579-581). Shoukry also described a bizarre late-night call

from a clearly intoxicated Griffiths in 2002, after Griffiths learned that Shoukry

had begun auditing company expenses and receipts. Griffiths warned that if

Shoukry found "anything," she should report it to Tejpar, but not to Mr. Bennett, or else her company shares would become worthless. (A-592, 598-599). Shoukry also recalled that in 2007, several years after Mr. Bennett left BEI, Mr. Bennett began seeking additional information concerning past wire transfers to GMEC, and that he appeared visibly surprised by what he had learned. (A-593-595).

Mr. Bennett then called Dr. Spencer Wetter, a neuroscientist, who testified regarding Mr. Bennett's dyslexia, and how that dyslexia would affect his reading comprehension. Next, Mr. Bennett called EPA agent Paul Brezinski to confirm inconsistencies in Griffiths' testimony (A-608-626; *see also* p. 19, *supra*), and defense paralegal Ryan Forman, to confirm which records had and had not been received by the defense (A-626-637).

Finally, Mr. Bennett testified in his own defense. To start, he explained his background as the self-made son of a Welsh electrician and seamstress, and his progression from a poverty-stricken upbringing in Depression-era Wales to become the inventor of record on 17 patents for environmental cleanup-related equipment and processes, and the founder of BEI. (A-638, 638.1). By 2000, BEI was a successful company, and he had begun making plans to retire, including by hiring Peter Richardson to be president with the expectation that Richardson would take over the role of CEO. (A-640-642, 645, 651, 654). In 2000, BEI moved its main office and virtually its entire sales staff to the Toronto area, but Mr. Bennett

chose to stay behind in Vancouver. (A-640-642, 663). After Richardson's hiring, Mr. Bennett increasingly worked from home, frequently travelled for business and pleasure, and spent several months each year at a vacation home in California. (A-642, 646-648). Due to his age and dyslexia, Mr. Bennett had significant difficulty with email, particularly while traveling. (A-648-651).

After BEI's office relocation, Richardson took over day-to-day operations, including marketing (A-645, 651), while Mr. Bennett focused on investor relations, the permitting and construction of a new plant, and the company's succession plan (A-645-648, 665-666). Mr. Bennett relied on his staff to review and approve company expenses. (A-657). Mr. Bennett was only peripherally involved in the bidding process: he did not review bid solicitations or prepare bid proposals, but he was kept generally informed as to the prices that BEI would bid. (A-665, 672, 679).

Mr. Bennett believed, like Griffiths and Tejpar, that BEI was uniquely well-suited to perform the Federal Creosote job, and testified he was not aware of "any other company at that time that could actually compete with us." (A-661; *see also* A-668-669, 680). Given the lack of competition, Mr. Bennett did not believe BEI had any need to pay bribes to win the Federal Creosote job, and was never aware of BEI doing so. (A-676).

23

In the period between BEI's March 14, 2002 bid and May 15, 2002 rebid on Phase II, Mr. Bennett learned that Griffiths would receive a "last look" at the anticipated bids of BEI's competitors, and that BEI would have an opportunity to beat those competitor's prices. Mr. Bennett had no reason to believe those facts suggested illegal activity, because the Phase II bidding was not "sealed"; Mr. Bennett expected that Sevenson would rationally favor BEI in light of its superior technology and track record; and when prime contractors regularly shared pricing-related "scuttlebutt," it was often, in Mr. Bennett's experience, deliberately inaccurate and designed to induce bidders to lower their prices. (A-679-681, 684, 687-694, 697-701). The term "last look" did not convey an illicit connotation to Mr. Bennett; indeed, that term was discussed openly, including during a meeting of BEI's Board of Directors, where a former senior official at the Canadian Ministry of the Environment, and the former Governor of Michigan were present. (A-699-700).

With respect to the 5:40 a.m. call that the government had portrayed as nefarious, Mr. Bennett recalled that Griffiths had called to alert Mr. Bennett that he (Griffiths) was unexpectedly unable to attend the bid opening that day, and sounded drunk on the call—a recollection consistent with Griffiths' acknowledged history of alcohol and drug use. (A-396, 598).

24

With respect to the gifts and entertaining expenditures that the government portrayed as kickbacks, Mr. Bennett never understood them as such. Mr. Bennett viewed the hockey game BEI hosted after Phase I as a potentially valuable networking opportunity to build a relationship with Sevenson—a contractor on numerous private-sector jobs. (A-675). Mr. Bennett approved the cruise on the understanding that BEI would pay only its own employee's share, and demanded reimbursement when he discovered Griffiths had committed BEI to paying the entire cost. (A-704-712). Contemporaneous emails evidence that Mr. Bennett directed an employee to invoice Sevenson for the cruise expenses. (A-933). The employee in turn emailed Griffiths—and not Mr. Bennett—to ask "how were we going to handle this," signaling that she, and Griffiths, chose not to comply with Mr. Bennett's instruction. (A-933). Mr. Bennett understood other gifts and expenditures related to the numerous other private-sector jobs that BEI was simultaneously pursuing or performing with Sevenson – rather than to the Federal Creosote site. Contemporaneous emails confirmed that Griffiths routinely sought to justify entertainment expenditures benefitting Sevenson by invoking various private-sector jobs, both real and fictional. (A-234-239, 268-269, 415-416, 970, 935, 971).

Regarding GMEC, Mr. Bennett never was told that it was a sham company controlled by McDonald, and had no reason to doubt that GMEC was performing

bona fide soil testing work at the site. The fake GMEC invoices did not raise red flags because lab costs were among BEI's largest expenses, and BEI commonly used labs favored by the prime contractor. (A-718-719).

### C.    The Verdict

On March 16, 2016, the jury found John Bennett guilty of both counts. (A-881-883).

## II.    The Post-Trial Motions

At both the close of the government's case and the close of all evidence, Mr. Bennett moved for a judgment of acquittal (A-552, 582.2-584, 873-878), and he renewed those motions in post-trial briefs. (Docket Entry 363). Mr. Bennett also moved for a new trial. (Docket Entry 363). After oral argument, the District Court denied the motions in a brief oral ruling on July 20, 2016. (Docket Entry 379).

## III.    John Bennett's Sentencing

On August 9, 2016, John Bennett was sentenced principally to an aggregate term of 63 months' imprisonment and $3,808,065.72 in restitution.

## SUMMARY OF ARGUMENT

The central issues in this case were whether Mr. Bennett made or knew of any material misrepresentations sufficient to demonstrate his participation in a scheme to defraud, whether Mr. Bennett acted with intent to defraud, and whether Mr. Bennett provided or knew of another providing benefits to Sevenson that

qualified as kickbacks under the Anti-Kickback Act. On each of these points, the evidence was insufficient, and the government was able to secure Mr. Bennett's conviction only due to a cascade of errors by the District Court, any one of which would justify reversal, and which in combination deprived Mr. Bennett of his constitutional right to a fair trial.

First, the evidence that John Bennett made any misrepresentation was non-existent. The government's fraud charge was instead based on Mr. Bennett's alleged knowledge of Griffiths' representation in a Phase II purchase order that BEI would comply with the terms of the "principal contract documents," which the government contended required compliance with the Anti-Kickback Act. But neither John Bennett nor anyone else at BEI ever saw the principal contract documents, and he thus had no way of knowing whether Griffiths' signature on the purchase order was a material misrepresentation. The evidence was thus insufficient to prove a scheme to defraud. Further, the evidence was insufficient to prove intent to defraud, because the bids BEI submitted in connection with Phase II were the same both before and after kickbacks were paid, which demonstrated that John Bennett did not contemplate harming the purported victim, the EPA. Further still, the evidence was insufficient to prove that Mr. Bennett participated in a kickback conspiracy with Griffiths, because the evidence did not show that Mr.

Bennett intended to provide benefits "improperly," and instead showed at most that he intended to generate goodwill with the prime contractor.

Second, the government impermissibly attempted to fill these gaps in its proof by relying on the testimony of an Army Corps employee, Mari Shannon, who testified that the benefits provided to Sevenson were kickbacks under the Anti-Kickback Act, and she would expect subcontractors to know this. The District Court never qualified Shannon as an expert, so her testimony applying the Anti-Kickback Act to the facts of this case was improper expert testimony. In addition, her testimony was not helpful to the jury, because it merely told the jury what result to reach based on facts the jury should have been evaluating for itself, in violation in Federal Rule of Evidence 701.

Third, the government also impermissibly attempted to fill the evidentiary gaps with reams of phone records—on which the government relied heavily in summation—without any live witness to authenticate them. The District Court relied on the certification of a foreign official to admit some of the records, and relied on the residual hearsay exception in Federal Rule of Evidence 807 to admit other records, but both of those rules require that no real question exist as to the reliability of the records. Here, the District Court erred because serious questions existed about the reliability of the phone records, where they were produced together with records that were evidently altered or forged.

Fourth, the government ensured that it would obtain a conviction by relying on improper and inflammatory rhetoric in summation that criticized Mr. Bennett for "com[ing] into this country" from abroad and breaking the laws, thereby improperly inviting the jury to convict him because he was a foreigner.

Fifth, the District Court sealed the case for the government by delivering an erroneous jury instruction that distorted the Anti-Kickback Act.

Sixth, each of these errors alone would require a new trial, and that result is especially appropriate when the errors are viewed in combination under the cumulative error doctrine, because they worked together to deprive Mr. Bennett of his constitutional right to a fair trial.

Seventh, and finally, the District Court's six-year, three-month sentence of John Bennett, who is 80 years old, was procedurally and substantively unreasonable.

The trial errors individually and collectively were not harmless. Given Mr. Bennett's unblemished record, the overwhelming evidence that BEI had no reason to pay bribes as it was the only company that could do the job, evidence that key aspects of the charged conspiracy were hidden from Mr. Bennett, and the stunning history of duplicity and prevarication by the government's star witness, Griffiths, the trial errors in all likelihood influenced the outcome of what was otherwise a close case.

29

# ARGUMENT

## I.    The District Court Erred In Denying Mr. Bennett's Rule 29 Motion Because the Evidence Failed to Show that He Knew of Material Misrepresentations, Acted with Fraudulent Intent, or Acted with Intent to Pay Unlawful Kickbacks To Get Favorable Treatment

### A.    Standard of Review

This Court "exercise[s] plenary review over a district court's denial of a motion for judgment of acquittal based on the sufficiency of the evidence." *United States v. Berrios*, 676 F.3d 118, 132 (3d Cir. 2012). Although this Court's review for sufficiency is deferential, this Court will *only* "sustain the jury's verdict 'if there is substantial evidence, viewed in the light most favorable to the government, to uphold the jury's decision.'" *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 430 (3d Cir. 2013) (*en banc*) (quoting *United States v. Gambone*, 314 F.3d 163, 170 (3d Cir. 2003)).

### B.    The District Court Erred In Denying Mr. Bennett's Rule 29 Motion On Count Two Because the Government Did Not Introduce Any Proof Whatsoever that Mr. Bennett Knew of Any Material Misrepresentation, and Because the Proof Affirmatively Showed the Absence of Intent to Defraud

#### 1.    Applicable Law

The major fraud statute makes it a crime to "knowingly execute[], or attempt[] to execute, any scheme or artifice with the intent (1) to defraud the United States; or (2) to obtain money or property by means of false or fraudulent

pretenses, representations, or promises" in connection with federal contracts worth $1,000,000 or more. 18 U.S.C. § 1031.

To prove a scheme to defraud, the government must prove "materiality of falsehood." *Neder v. United States*, 527 U.S. 1, 25 (1999) (mail, bank, and wire fraud statutes); *see United States v. Rybicki*, 354 F.3d 124, 146 n.20 (2d Cir. 2003) (*en banc*) ("The phrase 'scheme or artifice to defraud' requires 'material misrepresentations.'"). "In general, a false statement is material if it has a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed." *Neder*, 527 U.S. at 16 (internal quotation marks omitted). In addition, because major fraud is a specific-intent crime, the government must prove that the "defendant knew the scheme involved false representations." *United States v. Stalnaker*, 571 F.3d 428, 436 (5th Cir. 2009) (wire fraud) (internal quotation marks omitted).

In the alternative, a scheme to defraud also can be committed by the omission or concealment of a material fact instead of a material misrepresentation, but only where a defendant failed to speak when he had a duty to do so. *See Chiarella v. United States*, 445 U.S. 222, 235 (1980) ("When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak."). Where, as in the present case, the jury is charged "only as to a theory of fraud through an affirmative misstatement," however, appellate courts "review the proof

31

at trial only by reference to this charged theory," and do not consider an omission theory of fraud. *United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 663 (2d Cir. 2016).

### 2. Discussion

#### a. The Government Failed To Prove Beyond A Reasonable Doubt That Mr. Bennett Knew of Any Material Misrepresentation in Connection with the Phase II Bidding

The Court should order the District Court to enter a judgment of acquittal on Count Two—which only concerned Phase II—because the government failed to prove in its case-in-chief that Mr. Bennett knew of any "material[] falsehood[s]." *Neder*, 527 U.S. at 25. At trial, the government argued in summation that it had proved this element by showing that Mr. Bennett "lied" in the Phase II purchase order in which, the government claimed, Mr. Bennett allegedly "stated that Bennett Environmental was to be in strict compliance . . . [w]ith the Anti-Kickback Act." (A-819, 832-833). But the evidence failed to show that Mr. Bennett made or knew of any misrepresentations in the Phase II purchase order Griffiths signed.

Contrary to the government's claim, the Phase II purchase order itself does not contain any representation that BEI would "be in strict compliance" with the Anti-Kickback Act. Rather, the purchase order states only that BEI would work "in strict compliance with the principal contract documents." (A-895). Those principal

contract documents contain a reference to the Anti-Kickback Act (A-885-886), but the proof at trial showed that neither Mr. Bennett nor anyone else at BEI ever saw the principal contract documents. (A-148; 475). Government witness Mari Shannon explained that the Army Corps does *not* communicate anti-kickback requirements to subcontractors, and instead relies on prime contractors like Sevenson to communicate these requirements to subcontractors. (A-432-433). The government's star cooperator, Griffiths, confirmed that he did not ever "receive or . . . view a copy of the prime contract." (A-148, 324-325).

Nor was there any other basis in the government's proof for the jury to infer that Mr. Bennett was aware of the terms of the prime contract. The prime contract is a complicated 196-page single-spaced assemblage with a multitude of provisions having no relevance to BEI's work, and contains dozens of blanks where neither the Army Corps nor anyone else bothered to insert key text. (A-884-887 (excerpt of prime contract); GX 3a through 4c). The government's own witness at trial, Richard Puvogel, a professional with decades of experience at the EPA, was unable to speculate as to the prime contract's contents, and stated he had never seen a similar prime contract. (A-116, 128). Mr. Bennett had even less reason to know the prime contract's contents, as Mr. Bennett and his Canadian company had minimal experience performing work in the United States. (A-138). Prime contracts are not uniform, and do not universally contain the same representations,

33

warranties, and clauses concerning the Anti-Kickback Act as the prime contract at issue in this case. (A-556, 885-886). No reasonable juror could have inferred that Mr. Bennett was aware of the contents of this prime contract.

Because the proof failed to show that anyone at BEI, including Mr. Bennett, ever saw the prime contract, and because the proof provided no basis for the jury to infer that Mr. Bennett knew its terms, the government failed to show that Mr. Bennett knew that the representation in the purchase order regarding compliance with the prime contract was a material misrepresentation that could be the basis for a fraud charge. *See U.S. ex rel. O'Donnell*, 822 F.3d at 663 ("freestanding 'bad faith' or intent to defraud *without accompanying conduct* is not actionable under the federal fraud statutes," and "on the affirmative misrepresentation theory charged to the jury, the Government needed to show false or misleading statements made with fraudulent intent.") (emphasis added).

Mr. Bennett pointed out this gaping failure of proof to the District Court in his Rule 29 motion, and the District Court's denial of his motion was premised on a clear legal error. In particular, the District Court rejected Mr. Bennett's argument that the proof was insufficient based on "*testimony from Bennett himself*, allud[ing] to the fact that he was aware of the prohibition on kickbacks." (A-977.7). Because Mr. Bennett moved for a judgment of acquittal at the close of the government's case pursuant to Rule 29(a) (A-552, 584-588), however, the District Court was

34

"required to . . . determine whether an acquittal [is] appropriate *based solely on the evidence presented by the government*," and that review does not consider "evidence presented in the defense case." *United States v. Brodie*, 403 F.3d 123, 133-34 (3d Cir. 2005) (emphasis added); *see* Fed. R. Crim. P. 29(b). Thus, the District Court erred when it relied principally on Mr. Bennett's own testimony to deny his Rule 29 motion.[7]

Courts of Appeals have not hesitated to reverse fraud convictions where the proof does not show a knowingly-made material misrepresentation. For example, in *United States v. Gee*, two defendants were convicted of mail and wire fraud at trial based on their involvement in the production of equipment that buyers could use to descramble encrypted cable television programming. *United States v. Gee*, 226 F.3d 885, 890-91 (7th Cir. 2000). On appeal, the defendants challenged the sufficiency of the evidence of fraud, and the government responded that the element of a material misrepresentation had been satisfied because "end-users misrepresented and concealed the use of the illegal descrambler units from cable operators." *Id.* at 892. The Seventh Circuit rejected this argument and reversed the

---

[7] In his testimony, Mr. Bennett acknowledged that—at the time of his trial, after the prime contract was displayed in court by the government—he understood that document included rules against kickbacks. (A-723). Even if the District Court had been permitted to consider Mr. Bennett's testimony, that testimony demonstrates nothing more than the unsurprising fact that he was aware of the contents of an exhibit introduced into evidence at his own trial.

mail and wire fraud convictions, writing that whatever the devices' capabilities, the "government did not proffer any evidence that defendants made any false or misleading statements," so "no rational jury could have found the essential element of a material falsehood." *Id.*; *see also United States v. Hodge*, 150 F.3d 1148, 1151 (9th Cir. 1998) (reversing wire fraud convictions because the government failed to prove that certain certifications in a government contract were intended to be false).

As in *Gee* and *Hodge*, even in the light most favorable to the government, the evidence failed to establish the key element that John Bennett knew of a material falsehood. The government should not be able to imprison an 80-year old man based on a single line in a purchase order cross-referencing a prime contract that he never saw. Mr. Bennett's conviction on Count Two should be reversed on this basis alone.

> **b.  The Government Failed To Prove Beyond A Reasonable Doubt That John Bennett Acted With Specific Intent To Defraud in Connection with the Phase II Bidding Because BEI's Bid Remained the Same Before and After Griffiths Entered Into an Agreement with McDonald to Pay Kickbacks**

The Court also should enter a judgment of acquittal on Count Two because the evidence was insufficient to prove that Mr. Bennett acted with specific intent to defraud the government. To show that John Bennett acted with "intent to defraud," the government had to prove that harm or loss to the victim "was *contemplated* by

the schemer." *United States v. Gole*, 158 F.3d 166, 167 (2d Cir. 1998) (internal

quotation marks omitted) (emphasis in original). The government sought to

demonstrate that Mr. Bennett contemplated harming the EPA by submitting to

Sevenson a higher bid than it would have absent the kickbacks, but the evidence

fell well short of making this showing. Instead, the evidence showed that BEI's bid

on Phase II remained identical both before and after any alleged kickbacks were

paid, thereby demonstrating the absence of intent to harm the EPA.

Throughout the trial, the government pressed its theory that the EPA was

harmed because BEI's bid on Phase II was higher than BEI would have otherwise

bid if it had not been paying kickbacks.  In particular, the government argued that

(1) BEI submitted an initial bid of "$485" per ton for the Phase II contract in early

2002; (2) shortly thereafter, Mr. Bennett and others at BEI reached a corrupt

agreement whereby McDonald would provide BEI with confidential inside

information regarding BEI's competitors' bids, in exchange for kickbacks; and (3)

as a result of that agreement, in a re-bid of the contract on May 15, 2002, BEI put

in a bid of $498.50 per ton, reflecting an increase of $13.50 "to cover the cost of

the kickbacks," part of which would go to McDonald and the rest of which would

be "extra profit to Bennett Environmental." (A-112-113 (gov't opening); A-870

(gov't rebuttal summation)).

The evidence actually introduced at trial, however, bore no resemblance to the government's slanted story. Rather, the evidence showed that, on March 14, 2002, BEI submitted its initial bid for Phase II of $498.50 per ton, not $485 as the government claimed. (A-419). In an email sent two days before the March 15, 2002 deadline for bid submissions, Peter Richardson, BEI's president, unequivocally said: "we [BEI's management] are all happy with current pricing and we just want you to book it at that price if possible." (A-926). As Griffiths explained, the corrupt arrangement with McDonald began in a meeting at the Ramada hotel bar in Manville, New Jersey, on March 28, 2002—weeks after BEI already had submitted a bid of $498.50. (A-167). Contemporaneous documents confirmed that discussion of "last looks" did not begin until May 2002—months after BEI already had submitted its bid of $498.50 on March 14, 2002. (*See* A-923 (May 6 email), A-926 (May 13 email), A-928 (May 14, 2002 email)).

That chronology is key because BEI submitted the same bid in May 2002, after allegedly agreeing to pay kickbacks to McDonald, and after allegedly hearing that a competitor was going to be submitting a lower bid. (A-183-184, 419-420). On May 6, 2002, after a rebid was announced, McDonald told Griffiths that BEI's only competitor for this phase, Safety Kleen, was expected to submit a bid of approximately $400 per ton, and Griffiths suggested in an email that if Safety Kleen came in "at 400 on the nose," it might be "prudent for us to become the low

bidder by a dollar or two." (A-923). On May 15, 2001, however, notwithstanding Griffiths' suggestion, BEI again submitted a bid of $498.50 per ton, which was exactly the same as BEI's initial bid. (A-419-420). Thus, the price charged to the EPA could not have been "inflated" by this agreement.

In its summation, the government argued that it had proven Mr. Bennett's "intent to defraud" with respect to Count Two by showing that BEI "w[on] contracts guaranteed at inflated prices that included the kickbacks." (A-848). But the evidence did not show that BEI won the Phase II contract—the sole contract at issue in Count Two—at an "inflated" price that included kickbacks. In the absence of any proof that BEI intended to overcharge the EPA as a result of the kickbacks, the government cannot establish that BEI intended to harm the EPA. Speculation that the absence of a kickback would have translated into a lower bid price is insufficient as a matter of law to establish fraudulent intent, since a kickback may be paid out of a bidder's own profit rather than from the government's pocket. *See United States v. Zauber*, 857 F.2d 137, 146 (3d Cir. 1988). In past cases, when the government has sought to argue that "it is entitled to the kickback money *regardless of overcharge*," that theory has been conclusively rejected. *United States v. Johns*, 742 F. Supp. 196, 214 (E.D. Pa. 1990), *aff'd*, 972 F.2d 1333 (3d Cir. 1991) (emphasis in original).

The absence of proof of Mr. Bennett's intent to overcharge the EPA alone requires this Court to order Mr. Bennett acquitted of Count Two, but the failure of proof here went beyond that. The evidence not only failed to show any overcharge with respect to Count Two, but, in fact, affirmatively demonstrated the absence of any overcharge, in that it demonstrated that BEI maintained a consistent bid both before and after it purportedly agreed to pay McDonald $13.50 per ton. (A-419-420) ("Exactly the same price, isn't it Mr. Griffiths? . . . A: It appears to be."). This evidence is at least equally consistent with the theory that BEI intended to pay the $13.50 from its own funds as it is with the theory that BEI intended to pass this cost on to the EPA as an overcharge. Moreover, the failure of the evidence to show a material misstatement is consistent with the fact that BEI had no need to commit fraud to get the Phase II contract. Rather, the evidence showed BEI was overwhelmingly the most experienced and best value firm for the job. Because the evidence was insufficient to prove Mr. Bennett intended to harm the EPA in the Phase II bidding, his conviction should be reversed.

### C. The District Court Erred In Denying Mr. Bennett's Rule 29 Motion On Count One

#### 1. The Government Failed To Prove The Major Fraud Object Beyond A Reasonable Doubt Because the Evidence Failed to Show Material Misrepresentations or Intent to Defraud

For the same reasons the proof was insufficient to support Mr. Bennett's conviction on Count Two, it was insufficient to support the jury's finding that the

government had proved the major fraud object of the conspiracy charged in Count One. Although Count Two was limited to the Phase II bidding, and Count One also encompassed the bidding in Phase III, that distinction makes no difference. The government did not allege any additional material misrepresentations to support Count One, beyond the purchase orders discussed above. Nor did the government introduce any additional evidence that BEI would have bid lower during the Phase III bidding and that it raised its price based on improper information received from McDonald.

> **2. The Government Failed To Prove The Anti-Kickback Object Beyond A Reasonable Doubt Because the Evidence Failed to Prove Intent to Obtain Favorable Treatment Improperly**

The proof also was insufficient to support the anti-kickback object charged in Count One. To prove a violation of the Anti-Kickback Act, the government must prove that a subcontractor provided money or some other thing of value to a prime contractor "to improperly obtain or reward favorable treatment" in connection with the contract. 41 U.S.C. § 8701. To prove this object, the government principally relied upon evidence of what it alleged were kickbacks provided to McDonald: (1) wire transfers to GMEC; (2) the hockey game; (3) the Mediterranean cruise; and (4) the plasma television and wine cooler that Griffiths gave to McDonald. The evidence on each of these items was insufficient.

First, as to the GMEC payments, the evidence failed to prove that Mr. Bennett knew that GMEC was a shell company for McDonald. Rather, the evidence showed that once Griffiths himself realized that GMEC was a shell for McDonald, he deliberately hid this from Mr. Bennett. (A-612-614). Although Griffiths claimed at one point to have told Mr. Bennett about GMEC (A-194), the truth is that when Griffiths first met with the government, years before his trial testimony, Griffiths told the government that he had never told Mr. Bennett that GMEC was associated with McDonald. (A-614). The failure of proof on this point is evident in the jury's finding that the government did not prove the wire fraud object charged in Count One, which was based on the wire transfers to GMEC.

Second, with respect to the hockey game, both of the government's cooperating witnesses testified that the hockey game was not intended by anyone at BEI to serve as a kickback to Sevenson. (A-252-255, 490-491, 537). The game occurred on December 14, 2001, after BEI had won and was actively working under the Phase I subcontract; McDonald was not yet project manager; and Griffiths testified that he did not enter into a conspiracy with McDonald until the following spring. (A-331).

Third, with respect to the cruise, Griffiths testified that he "framed" the cruise for Mr. Bennett as a way for BEI to get future private jobs with Sevenson by building its relationship with Sevenson, not as a way to get an improper advantage

42

in bidding. (A-256-257). In a contemporaneous email, Griffiths portrayed the cruise to Mr. Bennett as relating to two prospective private-sector jobs in particular: the Ciba-Geigy and Diamond Alkali sites. (A-931). A second cooperating witness, Tejpar, similarly testified that the purpose of the cruise was "relationship building" and "mak[ing] sure we had strong relationships" with Sevenson, not to obtain or reward favorable treatment. (A-503). The evidence also showed that Mr. Bennett was deliberately excluded from key communications regarding the cruise, including a call with Sevenson's CFO (A-932) and communications regarding efforts to obtain reimbursement after the cruise (A-933, 934).

Fourth, with respect to the plasma television and wine cooler, the evidence showed that Griffiths disguised the wine cooler on his expense reports so as to appear to be a legitimate purchase of a "sample cooler" to store soil samples (A-242) and that Mr. Bennett did not learn about the television until a month after it had already been purchased and shipped (A-939; 499-500).

On the whole, to the extent Mr. Bennett was aware of these various payments and gifts to McDonald at the time they were given, no rational jury could have found that Mr. Bennett intended to act "improperly." To the contrary, the proof on this object was at least equally consistent with the theory that Mr. Bennett

43

sought to obtain goodwill from McDonald properly in the hopes of future private

projects.

For all these reasons, no rational trier of fact could have found Mr. Bennett

guilty of conspiracy to commit major fraud and to provide kickbacks.

## II.    The District Court Erred By Allowing a Government Lay Witness to Offer Materially Inaccurate and Highly Prejudicial Testimony Concerning the Application of Technical Regulations and Mr. Bennett's State of Mind

One reason the government was able to obtain a conviction despite the

insufficient evidence was that the District Court improperly permitted a key

government witness, former Army Corps employee Mari Shannon, who was not

qualified as an expert, to give her lay opinion as to what the Anti-Kickback Act

provides, what she expected subcontractors like Mr. Bennett to know about the

anti-kickback rules and their alleged inclusion in the purchase orders BEI entered,

and worst of all, how those rules prohibited the conduct in this case. This

testimony was inadmissible under Federal Rule of Evidence 701 because it was

actually disguised expert testimony, because it was materially inaccurate, and

because it merely told the jury what result to reach. The District Court should have

excluded it, and the mere fact that the jury heard it undermined the fairness of Mr.

Bennett's trial.

## A.   Standard of Review

This Court reviews *de novo* whether the district court properly interpreted a rule of evidence. *United States v. Georgiou*, 777 F.3d 125, 143 (3d Cir. 2015). Only if a decision regarding admission of evidence was premised on a permissible view of the law is it reviewed for abuse of discretion. *Id.*; *see also Koon v. United States*, 518 U.S. 81, 100 (1996). An abuse of discretion occurs whenever the district court's "decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *United States v. Schiff*, 602 F.3d 152, 161 (3d Cir. 2010) (citation omitted).

If this Court finds that the District Court abused its discretion, this Court reviews "de novo whether that error was prejudicial or harmless." *United States v. Schneider*, 801 F.3d 186, 200 (3d Cir. 2015) (citation omitted). "An error is harmless when it is 'highly probable that it did not prejudice the outcome.'" *Id.* (internal quotation marks omitted). "[T]he Government bears the burden of showing that the error was harmless." *Id.*

## B.   Relevant Facts

Shannon was never noticed or qualified as an expert. Prior to Shannon's testimony, the defense objected to Shannon being allowed to give "an extra little charge to the jury" by discussing the legal contours of kickback law. Reflecting an

apparent misunderstanding of Rule 701, the District Court responded: "I don't really see the objectionable aspect of it." (A-411-412).

At the outset of Shannon's testimony, the government elicited that she had a master's degree in procurement, had studied "contracting law," had served in the Army, and had worked for the Army Corps for almost 20 years, finishing her service as chief of the military construction branch in contracting. (A-423-425). Turning to the Federal Creosote site, Shannon explained that she was involved in the project because her "mentor" was the "contract specialist" assigned to the site, so they "talked a lot about that project," and they reviewed "consent packages" together. (A-426-427). Shannon, however, never visited the Federal Creosote site. (A-428), was not personally involved in supervising the prime contractor, Sevenson, or any subcontractor, and no evidence established that she had any decision-making authority over any of the contracts forming the basis of the charges against Mr. Bennett (A-465, *see also* 3/1/2016 Tr. at 128-129).

Next, the government elicited that Shannon had been "studying" the Federal Acquisition Regulation that incorporated anti-kickback rules for "my whole life." (A-431). Then, over Mr. Bennett's objection, the government displayed a portion of the prime contract—which there was no evidence Mr. Bennett ever saw—and asked Shannon to read the definition of "kickbacks" and the anti-kickback rules to the jury. (A-436-437). After she set out these rules, the government asked her to

46

"put that in everyday terms" for the jury, which she did, again over Mr. Bennett's objection, explaining that the anti-kickback rules meant "that you can't get a reward or any kind of compensation for doing something for another contractor." (A-442). She emphasized: "You can't be paid. . . . It's not authorized. It's illegal." (A-442). Responding to a defense objection, the government stated that it was "trying to get out [Shannon's] understanding of what [the] kickback laws are," and the District Court allowed Shannon to offer her "interpretation" of those regulations. (A-440-441).

The government asked Shannon whether bidders like Mr. Bennett were "aware of the rules prohibiting kickbacks. . . [and] the rules prohibiting obtaining confidential competitive bid information." (A-445-446). Again over Mr. Bennett's objection, Shannon answered that subcontractors like BEI were aware of these rules. (A-445-446).

The government next displayed a purchase order Griffiths had signed on behalf of BEI and asked Shannon to read the certification that BEI would act "in strict compliance with the principal contract documents." (A-449). After she did so, the government asked her "[b]ased on your experience at the Army Corps, what if anything do these terms in Bennett Environmental's purchase order say about kickbacks?" (A-450). The purchase orders actually said nothing about kickbacks. Nevertheless, Shannon replied that they say "[t]hat you can't give kickbacks, you

can't take kickbacks." (A-450). Shannon additionally testified that a bidder was never allowed to "see its competitor's bid before the bid opening" (A-432), and over a defense objection, Shannon testified that in her experience, bidders were aware of that rule. (A-446).

The most prejudicial and improper part of Shannon's testimony came at the end, when the prosecutor enumerated the various things of value given and payments made to McDonald and Sevenson in this case. With respect to each item, the government asked the non-expert witness Shannon both whether these were prohibited kickbacks, and whether a subcontractor like Mr. Bennett would have known that:

> Q      Now based on you[r] experience at the Army Corps, would a subcontractor paying for expensive meals and parties for the prime contractor be acceptable under the anti-kickback rules?
> A      Not at all.
> . . . .
> Q      . . . [W]ould you expect subcontractors to know that?
> A      Yes, I would expect them to know that they shouldn't be doing it.
> Q      Alright. . . . [B]ased on your experience at the Army Corps, would paying for sports and concert tickets for the prime contractor be acceptable under the anti-kickback rules?
> A      Not at all. . . .
> Q      And would you expect subcontractors to know that?
> A      I would.

> Q    And based on your experience at the Army
> Corps, would buying gifts like plasma TVs, wine
> and computers for prime contractor employees be
> acceptable under the anti-kickback rules?
> A    Not at all.
> Q    And would you expect subcontractors to
> know that?
> A    I would.
> Q    And based on your experience in the Army
> Corps, would paying for luxury cruises for prime
> contractor employees be acceptable under the anti-
> kickback rules?
> A    Not.
> Q    And would you expect subcontractors to
> know that?
> A    I would.
> Q    And based on your experience at the Army
> Corps, would it be acceptable for a subcontractor
> to wire hundreds of thousands of dollars to the
> project manager at a site?
> A    No.
> Q    And would you expect subcontractors to
> know that?
> A    Yes.

(A-458-460). After the first question in this series, Mr. Bennett objected that it was

improper "expert testimony about how the law applies." (A-459). The government

responded that Shannon's testimony was "not expert testimony" because it was

"based on her knowledge from working at the Army Corps." (A-459). Once again

misunderstanding the proper application of Rule 701, the District Court overruled

the objection and allowed the testimony to proceed. (A-459).

At the conclusion of this testimony, defense counsel argued that this

testimony was "incredibly prejudicial" because Shannon was allowed to "get on

the stand and give a legal conclusion." (A-465-466). Defense counsel requested a "mistrial" or a "curative instruction." (A-466). The District Court denied both requests. (A-467-468, 476).

In summation, the government highlighted Shannon's testimony, characterizing her as one of the "victims of the scheme" and emphasizing her expectation that subcontractors "knew the rules." (A-817, 822-823).

### C.   Discussion

Rule 701 of the Federal Rules of Evidence provides that a lay witness may testify in the form of an opinion only where the opinions are "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701.

Shannon's testimony applied the Anti-Kickback Act to the payments and gifts McDonald and Sevenson allegedly received in this case from BEI and concluded not only that these were illegal kickbacks, but also that subcontractors like Mr. Bennett must have known this. This testimony was improper, as it failed all of Rule 701's requirements.

First, Shannon's testimony was not based on her personal perception, and was instead improper expert testimony based on her specialized expertise

50

regarding the anti-kickback rules, such that it should have been excluded under Rules 701(a) and (c). The government defended her testimony at trial by arguing that it was "based on her knowledge from working at the Army Corps." (A-459). But the fact that Shannon may have encountered the anti-kickback rules in the course of her job does not make her testimony regarding those rules nontechnical or nonspecialized.

As multiple courts have confirmed in fraud cases, although lay witnesses may testify to their opinions under Rule 701 when they apply "familiar reasoning processes to their job experience," lay witnesses are not permitted to give their opinions concerning the application of technical laws and regulations such as anti-kickback statutes. *See United States v. Vega*, 813 F.3d 386, 393-95 (1st Cir. 2016) ("it was error to admit" testimony of lay witnesses "without qualifying them as expert witnesses," where one "described the anti-kickback statute" and the other said that payments at issue "were kickbacks"); *United States v. White*, 492 F.3d 380, 399-404 (6th Cir. 2007) (Medicare auditors could not testify about meaning of certain Medicare terms as lay witnesses); *United States v. Riddle*, 103 F.3d 423, 428-29 (5th Cir. 1997) (reversing conviction and ordering new trial because, among other reasons, bank auditor who testified as a lay witness impermissibly "functioned not as a witness relaying his own observations so much as a knowledgeable bank examiner who could provide the jury with an overview of

51

banking regulations and practices and who could authoritatively condemn [the

defendant's] actions"); *United States v. Baskes*, 649 F.2d 471, 479 (7th Cir. 1980)

(upholding district court's prohibition of lay witness testimony on "terms that

demand an understanding of the nature and scope of the criminal law" or as to "the

legal implications of conduct"). Because Shannon's testimony was expert

testimony regarding her specialized knowledge of the anti-kickback rules, it should

have been excluded.

Second, even if Shannon had been noticed and qualified as an expert—

which she was not—her testimony failed the "helpfulness" prong of Rule 701(b)

because it did not help the jury understand any fact in issue. Rather, her testimony

impermissibly told the jury in a conclusory fashion what it should find, repeating

that each and every payment and benefit to Sevenson alleged here was an illegal

kickback, and that she would expect subcontractors like Mr. Bennett "to know

that." (A-458-460).[8] By telling the jury what result to reach, this testimony ran

headlong into Rule 701(b)'s prohibition, which is "designed to exclude lay opinion

testimony that amount[s] to little more than choosing up sides" and "that 'merely

tell[s] the jury what result to reach.'" *United States v. Stadtmauer*, 620 F.3d 238,

---

[8] Shannon's testimony was particularly improper in light of the government's protestation that defense expert Christopher Ryan's testimony would be inappropriate if used as a "proxy" to portray what Mr. Bennett might have thought or understood (A-519.3, 519.5). Disregarding its efforts to cabin Ryan's testimony, the government repeatedly utilized Shannon to do just that.

262 (3d Cir. 2010) (quoting *United States v. Rea*, 958 F.2d 1206, 1215-16 (2d Cir. 1992)) (other internal quotation marks omitted). Worse still, Shannon's testimony was materially inaccurate in stating that a gift like an expensive meal would violate the anti-kickback rules. (A-458-460, 465-468). Those rules prohibit a quid pro quo, but not a mere gift. *See* FAR 52.203-7(a), 41 U.S.C. § 8701(2).

This Court previously has found testimony similar to Shannon's to be improper. In *United States v. Anderskow*, 88 F.3d 245 (3d Cir. 1996), this Court held it improper for a witness to testify that he "had no reason to believe" a co-conspirator "wasn't fully aware of what was occurring." 88 F.3d at 250. This Court ruled that such testimony "fails to meet Rule 701(b)'s 'helpfulness' requirement," for the simple reason that "it was for the jury to determine whether" the defendant "'must have known' that the Trust was engaged in a large-scale fraud," and the witness's opinion "essentially turned him into a thirteenth juror." *Id.*; *see also Rea*, 958 F.2d at 1219 (holding that testimony by a witness that the defendant "had to know" failed to meet Rule 701's helpfulness requirement).

In a subsequent case, this Court also explained that such opinion testimony about what was in the mind of a third person, even if not *per se* inadmissible, is unquestionably "difficult to admit" because either the jury will have the facts to form its own conclusion (in which case the testimony fails the requirement that it be "helpful") or the testimony will *lack* the underlying basis for the jury to form its

own opinion (in which case the opinion is not properly based on the witness's perceptions). *See United States v. Polishan*, 336 F.3d 234, 242-43 (3d Cir. 2003).

Consistent with these cases, the District Court erred when it admitted Shannon's testimony regarding what Mr. Bennett must have known.

The District Court's error in admitting Shannon's testimony cannot be excused as harmless. This testimony was particularly prejudicial because it gutted Mr. Bennett's defenses of lack of knowledge, and that any payments and gifts were to generate goodwill.

Further, the manner in which the government presented and amplified Shannon's testimony ensured its prejudicial impact. First, Shannon was offered to the jury as a long-time Army veteran with specialized knowledge of "contracting law" who had been studying the relevant regulations her "whole life." (A-423-425, 431). This gave her opinions regarding how those regulations applied here and regarding what Mr. Bennett must have known tremendous weight, as the jurors effectively were told that an experienced member of the Army Corps had concluded that Mr. Bennett had committed a crime. Indeed, no valid purpose existed to elicit Shannon's specialized training in "contracting law" except to cloak her opinions with the unjustified imprimatur of an expert witness on that subject.

Second, the most prejudicial part of Shannon's testimony came at the very end and went on at significant length, thereby ensuring its impact on the jury. (A-

54

458-460). Third, as described *infra*, the government compounded the error by eliciting similarly improper testimony from a second government witness, Robert Griffiths. Fourth, the government capitalized on the District Court's error in admitting Shannon's testimony by emphasizing the testimony in summation. The government went so far as to characterize Shannon as one of the "victims of the scheme," and reminded the jury that Shannon "expected contractors and subcontractors to know the rules." (A-817; *see also* A-822-823 (gov't summation: "Shannon explained that she expected that parties that contracted with the Government as prime or subcontractors" like Mr. Bennett "knew the rules and would abide by them.")).

The prejudice flowing from Shannon's testimony was magnified because the District Court allowed Griffiths to testify, over defense objections, to these same ultimate issues—Mr. Bennett's criminal state of mind, and the propriety of alleged payments under government procurement rules. For example, Griffiths was asked whether it was "permissible" for McDonald to share another company's bid information with BEI, and, over defense objection, Griffiths testified that his conduct was "not ethical." (A-203-204). Griffiths likewise testified, over objection:

"There's no doubt in my mind, [Mr. Bennett] was an active conspirator with me."

(A-227).[9]

Other Courts of Appeals have confirmed that similar errors are not harmless.

For example, the Court of Appeals for the First Circuit ordered a new trial based in

part on the very error that occurred here, which it referred to as the "usurpation

problem":

> The usurpation problem that arises when a witness
> testifies to opinions based on evidence that was also
> available to the jurors is compounded when the witness is
> a government agent whose testimony . . . is effectively a
> judgment on the question of guilt or innocence . . . . The
> jurors were told that . . . an experienced government
> agent had rejected appellants' . . . defense and concluded
> that they were participants in the [crime]. . . . It is the
> jury's singular responsibility to decide from the evidence
> admitted at trial whether the government has carried its
> burden of proof beyond a reasonable doubt.

*United States v. Meises*, 645 F.3d 5, 17-18 (1st Cir. 2011) (internal quotation

marks omitted); *see also United States v. Fenzl*, 670 F.3d 778, 782 (7th Cir. 2012)

(ordering acquittal on fraud charges brought by the Antitrust Division because, in

part, the Division relied on improper lay opinion testimony from a government

investigator to establish the materiality of the alleged misstatements); *Riddle*, 103

---

[9] For a lay witness like Griffiths to offer these conclusions regarding the lawfulness
of conduct and the existence of a "conspiracy" constitutes improper expert
testimony as it "demand[s] an understanding of the nature and scope of the
criminal law." *Baskes*, 649 F.2d at 478.

F.3d at 434-35 (erroneous admission of lay opinion testimony, combined with

other errors, required a new trial).

Shannon's testimony was not helpful to the jury, and it usurped the jury's

function. This Court should reverse on this basis alone: it is a miscarriage of justice

for an 80-year old man to be imprisoned based on this testimony.

### III. The District Court Abused Its Discretion By Admitting Unreliable Telephone Records Despite Indications That Some Phone Records Had Been Doctored

#### A. Standard of Review

This Court reviews a "district court's decision regarding the admissibility of

evidence . . . for abuse of discretion." *United States v. Higdon*, 638 F.3d 233, 238

(3d Cir. 2011) (citation omitted). If this Court finds that the District Court abused

its discretion, this Court reviews "de novo whether that error was prejudicial or

harmless." *Schneider*, 801 F.3d at 200 (internal quotation marks omitted).

#### B. Relevant Facts

Shortly before trial, the government identified to the defense certain phone

records that intended to introduce at trial. The proposed exhibits included dozens

of records grouped under several exhibit numbers. In general, these records

reflected the phone numbers and call histories of multiple BEI employees, and had

been produced to the government by BEI itself, rather than by the phone

companies. (A-354).

In order to authenticate the records in three of the proposed exhibits—Government Exhibits 904, 906, and 907—the government provided them to the company that appeared to have created them, Rogers Communications ("Rogers"), a Canadian communications company. A Rogers manager, Kristi Jackson, reviewed these records, and informed the government that two of them—Government Exhibits 904 and 906—appeared to be originals or copies of Rogers' business records, but that the third, Government Exhibit 907, contained documents that "may have been altered or forged," as they had an "unusual appearance" and listed an account number that "did not exist." (A-105, 357).

In letter dated February 12, 2016, the government informed Mr. Bennett of Jackson's findings, (A-105), and the government advised that it would not seek to introduce Government Exhibit 907 at trial. (A-407.1). In a subsequent letter dated February 26, 2016, the government provided notice that it intended to introduce the other Rogers records, contained in Government Exhibits 904 and 906 (the "Rogers records"), based on Jackson's written certification, in accordance with the procedure set out in 18 U.S.C. § 3505. (A-354-357).[10]

The other phone records the government obtained from BEI—proposed Government Exhibits 915, 916, 918, and 919—were created by other foreign

---

[10] Ms. Jackson's signed certification also swore that records of an unrelated phone company were genuine, an inaccuracy later acknowledged by the Government, which cast doubt on the reliability of her review. (A-358, 410)

telephone companies, Sun Group and Group Telecom, which no longer existed. The government asked the District Court, in a letter dated February 25, 2016, to admit those records pursuant to the residual hearsay exception in Federal Rule of Evidence 807, arguing that these records were inherently "authentic and trustworthy." (A-278-283). The government also argued that the records could be authenticated pursuant to Federal Rule of Evidence 901(b)(4), because they "have all the visual characteristics of phone records." (A-280).

In a letter dated February 28, 2016, Mr. Bennett objected to the admission of all of these records. (A-358).

On March 1, 2016, the District Court overruled the objections as to Government Exhibits 904 and 906 (pursuant to Section 3505), and Government Exhibits 915, 916, 918, and 919 (pursuant to the residual hearsay exception). The District Court explained that Jackson's certification was sufficient to authenticate Government Exhibits 904 and 906. (A-409). As to Government Exhibits 915, 916, 918, and 919, the District Court found "no indication that they are not reliable or that they're not actual records." (A-409). In particular, the District Court was persuaded that these records were authentic by the fact that "the documents do bear the insignia of the—of the companies." (A-409). Mr. Bennett renewed his objections at trial, where they were overruled. (A-407.2-5, 546-547).

In summation, the government relied heavily on the phone records. The government repeatedly referenced the phone records as one reason why the jury should not believe that Mr. Bennett "didn't know what was going on at his company" (A-818-819), and could infer Mr. Bennett was involved in the kickback scheme (A-840-841). The government also used the phone records to argue that the jury should credit Griffiths' testimony. (A-844). The government emphasized the need to "take a careful look at these phone records because they're *important*." (A-844-845 (emphasis added)).

In rebuttal, the government again relied on the phone records to corroborate Griffiths' testimony (A-859, 868) and to demonstrate Mr. Bennett's relationship with McDonald (A-868). The government repeated four times: "Take a look at the underlying records. . . And look at the records . . . . Take a look at those phone records . . . . And again, don't rely on the arguments of counsel, take a look at the records, themselves." (A-868-869).

### C. Discussion

The District Court abused its discretion when it admitted the phone records (A-946, 951, 956, 961), and this error was far from harmless, because these phone records were "important" to the government's case. (A-844-845).

As to Government Exhibits 904 and 906, the District Court admitted them pursuant to § 3505, which generally permits foreign business records to be

60

admitted where a foreign certification attests to the records' authenticity. But Section 3505 may not be used where "the source of information or the method or circumstances of preparation indicate lack of trustworthiness." 18 U.S.C. § 3505(a)(1). The circumstances here strongly indicate a lack of trustworthiness, because the records at issue were produced to the government by BEI—the same entity that produced other phone records that the foreign official, Jackson, identified as a likely forgery. The records should have been excluded. *See, e.g.*, *United States v. Dreer*, 740 F.2d 18, 20 (11th Cir. 1984) (affirming exclusion of records produced with forged documents).

The District Court also erred by admitting Government Exhibits 918 and 919 pursuant to Rule 901(b)(4) and the residual hearsay exception in Rule 807. First, under Rule 901(b)(4), the proponent of the evidence must adduce evidence that "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances" are sufficient to support a finding that the item is actually what it is purported to be. Fed. R. Evid. 901(b)(4). Here, the government never established that the Sun Group and Group Telecom phone records were legitimate records. The visual characteristics of these phone records were not alone sufficient to authenticate them, and the records contained other indicators that they were not reliable, such as missing pages and unidentified handwritten notes. (*See, e.g.*, A-956, 961).

The District Court compounded this error when it applied the residual hearsay exception in Rule 807 to allow the admission of Government Exhibits 918 and 919. "The Rule 807 residual hearsay exception is 'to be used only *rarely*, and in *exceptional circumstances*,' and is meant to 'apply only when certain *exceptional guarantees of trustworthiness* exist and when high degrees of probativeness and necessity are present.'" *United States v. Wilson*, 281 F. App'x 96, 99 (3d Cir. 2008) (emphasis added) (quoting *United States v. Bailey*, 581 F.2d 341, 347 (3d Cir. 1978)); *United States v. Wright*, 363 F.3d 237, 245 (3d Cir. 2004) (same). The admission of Government Exhibits 918 and 919 was error because they did not have the required "exceptional guarantees of trustworthiness" required when a defendant is effectively deprived of his confrontation rights. *Wright*, 363 F.3d at 245. In fact, they did not even have the *usual* guarantees of trustworthiness, let alone "exceptional" guarantees, because the records were produced by BEI, a defendant in a related case, and appeared to have been created by companies that no longer exist.

The District Court's error in permitting the introduction of all of these phone records was not harmless because these records formed a significant part of the government's case. The government relied on the phone records extensively at trial, using them in both the main and rebuttal summations to buttress Griffiths' credibility, to establish Mr. Bennett's relationship with McDonald, and to impeach

62

Mr. Bennett's own testimony. (A-840-841, 844-845, 859, 868-869). The

government thus cannot bear its burden of showing that "it is highly probable that

[the error] did not prejudice the outcome," as this Court requires. *Schneider*, 801

F.3d at 200 (internal quotation marks omitted). Further, had Mr. Bennett had the

chance to cross-examine a proper custodian, Mr. Bennett would have been able to

highlight the forged records the government obtained and further emphasize the

lack of reliability of both Griffiths and the government's case on the whole.

Accordingly, to the extent either count survives Mr. Bennett's sufficiency

challenge, this Court must order a new trial.

## IV.    The District Court Abused Its Discretion When It Denied Mr. Bennett's Mistrial Motion Based On Comments By The Government In Its Summations

### A. Standard of Review

The "decision to grant or deny a motion for a new trial lies within the

discretion of the district court," *United States v. Cimera*, 459 F.3d 452, 458 (3d

Cir. 2006), and the District Court's ruling on a challenge to prosecutorial

statements objected to at trial is reviewed for abuse of discretion, *United States v.*

*Brennan*, 326 F.3d 176, 182 (3d Cir. 2003).

### B. Discussion

The Court should grant a new trial because the government used an

improper appeal to the jury's "community conscience" in a misguided effort to

prejudice the jury against Mr. Bennett simply based upon his foreign nationality. In particular, in summation, the government told the jury to convict Mr. Bennett, who came to the United States from Canada, because "[y]ou cannot come into this country, get a Government funded project, and conveniently fail to pay attention to the rules that apply." (A-830). Comments such as these suggesting that Mr. Bennett's lack of citizenship in this country was a part of his alleged criminal conduct unfairly prejudiced the outcome. Indeed, the government's comments called to mind the near constant, heated, and emotional political debate regarding immigration today. Defense counsel objected and moved for a mistrial, but the District Court denied the motion. (A-850, 856). In the alternative, defense counsel asked for a curative instruction, but the District Court denied that as well. (A-850, 856).

In determining whether to order a new trial based on improper arguments by the prosecutor, this Court should look at three factors: "the scope of the improper comments in the overall trial context, the effect of any curative instructions given, and the strength of the evidence against the defendant." *United States v. Mastrangelo*, 172 F.3d 288, 297 (3d Cir. 1999). A "prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury," and if "the only conceivable purpose of the prosecutor's [remarks] was to prejudice the jury,"

the remarks are improper. *United States v. Modica*, 663 F.2d 1173, 1180 (2d Cir. 1981); *United States v. Johnson*, 231 F.3d 43, 47 (D.C. Cir. 2000).

Here, these considerations weigh in favor of a new trial. The government's remarks were an improper appeal to the jury's "community conscience," designed to inflame and incite emotions and fears of foreigners, and to place jurors into an us-versus-them mindset. *United States v. Solivan*, 937 F.2d 1146, 1148, 1151 (6th Cir. 1991) (ordering new trial based on government remark in summation: "I'm asking you to tell her and all of the other drug dealers like her . . . [t]hat we don't want that stuff in Northern Kentucky and that anybody who brings that stuff in Northern Kentucky . . . .") (emphasis omitted); *see United States v. Cannon*, 88 F.3d 1495, 1502 (8th Cir. 1996) (ordering new trial based on government statement: "There are bad people in the world, ladies and gentlemen. We are lucky where we live not to come in contact with as many as there may be in other parts of the country. But there are still some around here.").

Further, each of the factors this Court should review indicates that the remarks were prejudicial: the remarks came in the government's summation, when they would have most impact; the Court refused to give any curative instruction; and the evidence was not strong. The fact that the government's remark was "isolated to one portion of the trial, closing argument," does "not ameliorate [its]

prejudicial impact," where the remark was "misleading, inflammatory and prejudiced defendant's right to a fair trial." *Solivan*, 937 F.2d at 1155.

The prejudice caused by the government's improper appeal to the jury's community conscience was magnified by the way the government repeatedly misconstrued the record in both its main and rebuttal summations. For example:

1)    The government stated, as to the "principal contract documents," that "Mr. Griffiths read them . . . and the defendant read them." (A-833-834). In fact, as discussed above, the evidence showed that BEI never received these documents, which the government knew. (A-148).

2)    The government stated that "if the defendant and his company were playing by the rules, another company would have gotten the work" instead of BEI. (A-827). In fact, the government knew that no evidence demonstrated that any competitor provided a better value than BEI, under a "best value" standard. (*See* pp. 9-11, *supra*).

3)    The government stated that "Tejpar and Griffiths both testified they had no problem getting or reading their emails. Tejpar was on the same server, the "benvan" server as the defendant." (A-865). In fact, neither witness said this, and to the contrary, both witnesses testified to having some difficulty receiving emails, which the government knew. (A-487-488, 134, 245-246, 249, 968).

4)    The government stated that Bill McDermott—Sevenson's CFO—said in an email that the 2002 cruise was "breaking U.S. statutes." (A-862). In fact, the government knew that no such email from McDermott exists.

5)    The government stated that Mr. Bennett's dyslexia "doesn't affect someone's comprehension." (A-818). In fact, an expert witness testified that Mr. Bennett's dyslexia would affect Mr. Bennett's reading comprehension. (A-601-602).

Considered on the whole, the government's multiple misstatements of the record in the summations violated Mr. Bennett's due process rights, and this violation requires a new trial. *See United States v. Valentine*, 820 F.2d 565, 570 (2d Cir. 1987) (holding that new trial is required when the defendant's due process rights were violated by the prosecutor's misrepresentation of the evidence).

When these misstatements are considered in combination with the government's improper appeal to the jury's community conscience, they resulted in a fundamentally unfair trial. *See Solivan*, 937 F.2d at 1157 ("we cannot say that the government has demonstrated, beyond a reasonable doubt, that the prejudicial comments did not contribute to the defendant's conviction"). The government's comments would have been improper in any trial, but were particularly problematic given the recent focus of emotionally charged public and political

debate on NAFTA, border security, and the possibility of a relationship between immigration and crime.

## V.    The District Court's Instruction on the Anti-Kickback Act Was Erroneous and Prejudicial

### A. Standard of Review

This Court reviews preserved challenges to jury instructions for "abuse of discretion." *United States v. Beros*, 833 F.2d 455, 463 (3d Cir. 1987). In conducting this review, this Court asks "whether the charge, taken as a whole and viewed in the light of the evidence, fairly and adequately submits the issues in the case to the jury." *United States v. Fischbach and Moore, Inc.*, 750 F.2d 1183, 1195 (3d Cir. 1984) (internal quotation marks omitted). "The trial court should be reversed only if the instruction was capable of confusing and thereby misleading the jury." *Id.*

### B. Discussion

The District Court's charge erroneously stated, with respect to the Anti-Kickback Act object of the conspiracy charged in Count One:

> For purposes of this object, a kickback means any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind that is provided to a prime contractor, prime contractor employee, subcontractor, or subcontractor employee, to improperly obtain or reward favorable treatment in connection with a prime contract or a subcontract relating to a prime contract.  It is not enough to find that the defendant gave something of value to build general good will.

(A-812-813). This Court should vacate Mr. Bennett's conviction and order a new trial based on this overbroad jury instruction on what it means to "improperly obtain or reward favorable treatment" under the Anti-Kickback Act.

In the Supreme Court's recent decision in *McDonnell v. United States*, 136 S. Ct. 2355 (2016), the constitutional problem with the government's expansive reading of the bribery statutes was that it made "nearly anything a public official does—from arranging a meeting to inviting a guest to an event—count[] as a quo." *Id.* at 2372. Similarly, in the present case, the constitutional problem with the District Court's charge to the jury is that the charge made nearly anything the prime contractor here did that was favorable toward Mr. Bennett's company, BEI, count as "improper" favorable treatment.

The Anti–Kickback Act defines a "kickback" as a benefit given "to *improperly* obtain or reward favorable treatment in connection with a prime contract or a subcontract." 41 U.S.C. § 8701 (emphasis added). The Congressional report accompanying the 1986 amendments explains that "the term 'improperly' [was included] to ensure that exchange[s] made . . . [for] permissible purposes, such as innocent or incidental favors, are not included under the definition of 'kickback.'" H.R. REP. 99-964, 11, 1986 U.S.C.C.A.N. 5960, 5968 (Oct. 3, 1986). The District Court's charge to the jury, however, did not include any limit to

prevent the jury from convicting based on the kind of "innocent or incidental favors" Congress intended to exclude from the statute's sweep.

At trial, Mr. Bennett requested that the District Court instruct the jury that a violation of the Anti-Kickback Act requires "giving something of value in exchange for an "official act" (Docket Entry 305) or in exchange for "*some specific favorable treatment* to which the defendant was not otherwise entitled or which the defendant did not otherwise merit." (A-757-58, Parties' Proposed Jury Charges, dated March 9, 2016, 21-22). The District Court denied both requests. (A-726-731, 977.10).

In light of *McDonnell*, however, the District Court erred by not giving Mr. Bennett's proposed instruction, which sought to tie the kickback given to some sort of "official act" or "specific favorable treatment" to which the subcontractor was not entitled in order to avoid criminalizing instances where prime contractors lawfully provide incidental favorable treatment. Governor McDonnell asked the district court at his trial to give a jury instruction similar to the one Mr. Bennett requested in this case, and the district court there refused—a decision the Supreme Court rejected. Specifically, Governor McDonnell "asked the court to explain to the jury that an 'official act' must intend to or 'in fact influence a specific official decision the government actually makes." 136 S. Ct. at 2366. The Supreme Court adopted this requirement of specificity, holding that the "official act" in a bribery

70

prosecution must relate to a matter that is "specific and focused that is 'pending' or 'may by law be brought' before a public official." *Id.* at 2374. Just as McDonnell held that a bribery case must involve a "quo" that is "specific and focused," so too the "quo" in a kickback case must be some sort of "specific favorable treatment."

The District Court's failure to provide the jury instruction Mr. Bennett requested left the jury free to convict based on numerous gestures that were nothing more than incidental favors that do not qualify as the kind of specific favorable treatment that violates the Anti-Kickback Act. For instance, the evidence showed that McDonald served as a mentor to Griffiths, giving Griffiths his friendship, his information about the industry generally, and even his romantic advice about someone Griffiths wanted to date. (A-272-276). The evidence likewise showed that McDonald gave Mr. Bennett access to him in private phone calls and a meeting. (A-197, 548-549, 956, 961). There mere fact that McDonald had personal relationships with Griffiths and Mr. Bennett, however, without more, does not amount to the kind of specific favorable treatment that qualifies as criminal under the Anti-Kickback Act. *Cf. United States v. Newman*, 773 F.3d 438, 452 (2d Cir. 2014), *cert. denied*, 136 S. Ct. 242 (2015) (in insider trading case requiring a "quid pro quo" between the insider and the recipient of the inside information, government cannot prove the "quo" by "the mere fact of a friendship, particularly of a casual or social nature").

71

The evidence contained multiple other examples of incidental favors that do not qualify as specific favorable treatment. For example, the evidence showed that McDonald shared information with Griffiths concerning business developments at other companies, including both companies that had not bid on the Federal Creosote site (A-936, 416), and a company that had bid, but would be disqualified (A-173-174). McDonald also served as a reference for BEI, and made introductions that might lead to future work at other projects. (A-260, 263-265). McDonald additionally informed Griffiths, well in advance of the actual bidding, of his own conjecture of what other companies might bid; figures that turned out to be inaccurate. (A-923).

Even if other evidence at trial showed other instances of favorable treatment that would qualify as improper under the Anti-Kickback Act, this would not save Mr. Bennett's conviction. An error in jury instructions may only be excused as harmless if the Court can conclude that it was "harmless beyond a reasonable doubt." *Neder*, 527 U.S. at 16.

Here, as in *McDonnell*, the error here cannot be excused as harmless beyond a reasonable doubt, because it is possible the jury convicted Mr. Bennett "for conduct that is not unlawful." 136 S. Ct. at 2375. The government not only introduced all of the evidence of lawful incidental courtesies described above, but also emphasized this evidence in summation. For example, the government

72

repeatedly highlighted how Mr. Bennett had private phone calls and a private meeting with McDonald, how the two were "close," and how they "spoke regularly." (A-837, 868). The government also emphasized how a hockey game BEI sponsored was an effort to develop "the relationship" with McDonald and "get more" work, even though no specific favorable treatment was ever tied to the hockey game. (A-824). This record does not support a finding that the Court's instructional error was harmless beyond a reasonable doubt.

## VI. The Cumulative Effect of the District Court's Errors Warrants Reversal

Even if this Court finds that no one of the errors described above alone warrants a new trial, the cumulative prejudice flowing from all of these errors requires reversal.

The cumulative error analysis looks at whether a new trial is required when "the[] errors, when combined, so infected the jury's deliberations that they had a substantial influence on the outcome of the trial." *United States v. Hill*, 976 F.2d 132, 145 (3d Cir. 1992); *see United States v. Certified Envtl. Services Inc.*, 753 F.3d 72, 96-97 (2d Cir. 2014) (new trial required due to cumulative prejudice); *United States v. Rivera*, 900 F.2d 1462, 1469-70 (10th Cir. 1990) ("The cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error").

73

Viewing this case in its entirety—a case in which an 80-year old man who devoted his life to environmental clean-up is serving what is likely to be an effective life sentence in a case with deficient proof and shot through with prejudicial errors—this Court must reverse Mr. Bennett's convictions. As in *Certified Envtl. Services Inc.*, the government's case here was "not overwhelming," 753 F.3d at 96-97, particularly given the grave lack of credibility of the government's key witness, Griffiths. Further, errors infected multiple aspects of the proceedings, where the District Court permitted the jury to hear improper testimony from Shannon, admitted unreliable phone records, refused to correct the government's improper remarks in summation, and delivered an erroneous jury charge. A new trial is required. *See Riddle*, 103 F.3d at 434-35.

## VII.    Mr. Bennett's Sentence Was Procedurally and Substantively Unreasonable

The District Court made multiple errors in imposing sentence, not least of which the fact that it imposed a sentence of over five years on an 80-year-old man, with no prior criminal history, with a life-long career of invention and environmentalism, and whose health is failing at an increasing rate since being remanded after trial.

First, the District Court committed a procedural error by applying a four-level aggravating-role enhancement under the United States Sentencing Guidelines. The evidence showed Mr. Bennett was an organizer or leader of *BEI*,

but not an organizer or leader of the *charged criminal activity*. Mr. Bennett did not design the scheme or recruit participants, and key aspects of the scheme were concealed from him. (A-234-239, 268-269, 399-400, 415-416, 612-614). *See* U.S.S.G. § 3B1.2, comment n.4. The District Court acknowledged that McDonald, the mastermind of the scheme, had greatest culpability, and that Griffiths—not Mr. Bennett—"would sort of make the deal" on behalf of BEI, but erroneously applied a "manager" role enhancement because Mr. Bennett approved job promotions to Griffiths and "none of the payments would have been made" absent Mr. Bennett's approval. (A-981, 984). These facts are insufficient to support an aggravating role enhancement as they merely show that Mr. Bennett was acting in his role as CEO of his company, not actively "managing" the criminal conspiracy. *See* U.S.S.G. App'x C, amend. 794 (effective November 1, 2015).

The District Court compounded its procedural error by erroneously calculating the Guidelines with a four-level enhancement under Section 3B1.1(a), even though the court determined that Mr. Bennett was merely a "manager" rather than an organizer or leader—thus warranting only a three-level enhancement under Section 3B1.1(b). (A-981) ("I do find that Bennett was in fact in a leadership role, albeit a *manager* . . ." (emphasis added)).

Second, the District Court committed procedural error by ordering restitution in the amount of $3,808,065.72 without "explaining how the amount

of . . . restitution imposed was related to any loss caused by the conduct underlying the . . . offenses" to which Mr. Bennett was found guilty. *United States v. Furst*, 918 F.2d 400, 410 (3d Cir. 1990). The restitution order adopted, without analysis, the flawed calculations by the United States Probation Office. Probation calculated restitution based on three different purported losses to the EPA: (1) additional money that BEI charged the EPA for secure disposal of soil that it treated while it actually stockpiled the treated soil in its warehouse; (2) the so-called "$13.50" that BEI paid in kickbacks on Phase II that purportedly resulted in inflated price to the EPA; and (3) the difference between BEI's winning bid on Phase III and what was apparently a competitor's bid on Phase III that was roughly $100 per ton lower.

In fact, none of these bases are sufficient to support restitution. The first category of restitution, which amounted to $1,680,304, was based on a loss resulting from uncharged conduct, which is improper under this Circuit's precedent. *See United States v. Munchak*, 527 F. App'x 191, 197-98 (3d Cir. 2013). The second category of restitution, as discussed at length in Part I, *supra*, (*see* pp. 36-40), cannot be shown to have caused a loss to the EPA. As BEI's bid on Phase II never changed, the government cannot have proved that its bid was inflated by $13.50, and even if it was the $13.50 could only have been taken out of BEI's profits. The third category of restitution relied on an apparent competitor's bid about which no evidence had been presented at trial. Moreover, granting

restitution for a supposed lower bid on Phase III ignores the substantial evidence that that the increased speed of BEI's work outweighed any cost-impact of BEI's purported higher per-unit price. (A-177, 303-304).

Third, Mr. Bennett's sentence was substantively unreasonable. At sentencing, the defense presented extensive evidence on both Mr. Bennett's lifetime of good works—charitable contributions, environmental advocacy, environmental cleanup projects, a lack of criminal history, and extensive and valuable engineering innovation—and his advanced age and declining physical health. The Court erroneously found no need for leniency and imposed what will likely amount to an effective life sentence.

## CONCLUSION

For the foregoing reasons, the judgment of conviction on each count should be reversed.

Dated: New York, New York
      September 20, 2016

                              MORVILLO, ABRAMOWITZ, GRAND,
                                  IASON & ANELLO, P.C.

                    By:   /s/ Robert J. Anello
                        Robert J. Anello, N.Y. State Bar
                          Registration # 1708825
                        Richard F. Albert
                        Brian A. Jacobs
                        Jacob W. Mermelstein
                        Peter Janowski
                        Jocelyn Courtney Kaoutzanis
                        565 Fifth Avenue
                        New York, NY 10017
                        (212) 856-9600

## CERTIFICATE OF BAR MEMBERSHIP

I, Robert J. Anello, hereby certify that I am a member of the bar of this Court, having been admitted on April 1, 2016.


_/s/ Robert J. Anello_____
Robert J. Anello

## CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF
## APPELLATE PROCEDURE 32(a) AND LOCAL RULE 31.1

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned counsel of record hereby certifies that this brief contains 17,678 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), in compliance with this Court's September 15, 2016 order permitting the appellant to file a brief of no more than 18,000 words.

This brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because this brief has been prepared in a proportionally spaced typeface using the 2008 version of Microsoft Word in 14 point Times New Roman font.

This brief complies with the electronic filing requirements of Local Rule 31.1(c) because the text of this electronic brief is identical to the text of the paper copies, and the Vipre Virus Protection, version 3.1 has been run on the file containing the electronic version of this brief and no viruses have been detected.

By: /s/ Jacob W. Mermelstein

Jacob W. Mermelstein

## CERTIFICATE OF FILING AND SERVICE

I, Mariana Braylovskiy, hereby certify pursuant to Fed. R. App. P. 25(d) that, on

September 20, 2016 the foregoing Brief for Appellant and Appendix Volume 1

was filed through the CM/ECF system and served electronically on parties in the

case:

James J. Fredricks
Steven J. Mintz
United States Department of Justice
950 Pennsylvania Avenue, N.W., Room 3224
Washington DC 20530
202-307-1403
james.fredricks@usdoj.gov
steven.mintz@usdoj.gov


In addition, 7 copies have been sent to the court via express mail on the same date
as above.

/s/ Mariana Braylovskiy
Mariana Braylovskiy

**APPENDIX**

i

# TABLE OF CONTENTS

**Page**

Volume I:

Judgment, dated August 11, 2016 .............................    A-1

Notice of Appeal, dated August 16, 2016 .................    A-8

Amended Judgment, dated August 15, 2016 .............    A-9

Amended Notice of Appeal, dated August 30, 2016..    A-16

Volume II:

District Court Docket Entries .....................................    A-17

Indictment, dated August 31, 2009 ...........................    A-38

Letter from Richard F. Albert to the Honorable
    Susan D. Wigenton, dated June 8, 2015 ................    A-73

Declaration of Jacob Mermelstein, in Support of
    Motion for a Bill of Particulars and Brady
    Material, filed June 8, 2015
    (Omitted herein)

    Exhibit A to Mermelstein Declaration –
    Letter from Richard F. Albert to Helen
    Christodoulou, dated March 3, 2015 .....................    A-77

    Exhibit B to Mermelstein Declaration –
    Letter from Helen Christodoulou to Robert J.
    Anello, dated March 17, 2015, with Enclosures....    A-83

    Exhibit C to Mermelstein Declaration –
    Letter from Robert J. Anello to Helen
    Christodoulou, dated February 28, 2015 ...............    A-89

    Exhibit D to Mermelstein Declaration –
    Record of the Case for Prosecution .......................    A-99

ii

**Page**

Brief, in Opposition to Motion to Dismiss the
Indictment, dated November 13, 2015
(Omitted herein)

Exhibit 3 to Brief –
Second Voluntary Bill of Particulars...................... A-103

Letter from Mikhail Vanyo to Robert J. Anello,
dated February 12, 2016 ......................................... A-105

Excerpts from the Trial Transcript, dated
February 22, 2016.................................................. A-107

Excerpts from the Trial Transcript, dated
February 23, 2016.................................................. A-130

Excerpts from the Trial Transcript, dated
February 24, 2016.................................................. A-191

Excerpts from the Trial Transcript, dated
February 25, 2016.................................................. A-225

Letter from Mikhail Vanyo to the Honorable Susan
D. Wigenton, dated February 25, 2016................. A-278

Excerpts from the Trial Transcript, dated
February 26, 2016.................................................. A-284

Notice of Intention of Use Records of Regularly
Conducted Activity and Motion for a
Determination of Admissibility Pursuant to 18
U.S.C. § 3505 and Rule 104(a), Federal Rules of
Evidence, dated February 26, 2016 ....................... A-354

Letter from Richard F. Albert to the Honorable
Susan D. Wigenton, dated February 28, 2016 ....... A-358

Excerpts from the Trial Transcript, dated
February 29, 2016.................................................. A-374

iii

**Page**

Excerpts from the Trial Transcript, dated
    March 1, 2016......................................................... A-407

Excerpts from the Trial Transcript, dated
    March 2, 2016......................................................... A-478

Excerpts from the Trial Transcript, dated
    March 3, 2016......................................................... A-520

Excerpts from the Trial Transcript, dated
    March 4, 2016......................................................... A-542

Volume III:

Excerpts from the Trial Transcript, dated
    March 7, 2016......................................................... A-590

Excerpts from the Trial Transcript, dated
    March 8, 2016......................................................... A-659

Excerpts from the Trial Transcript, dated
    March 9, 2016......................................................... A-721

Parties' Joint Proposed Jury Charges, dated
    March 9, 2016......................................................... A-733

Excerpts from the Trial Transcript, dated
    March 14, 2016....................................................... A-810

Excerpts from the Trial Transcript, dated
    March 15, 2016....................................................... A-815

Excerpts from the Trial Transcript, dated
    March 16, 2016....................................................... A-880

Trial Exhibits:

Government's Exhibit 3a (Excerpts) –
    Pre-Placed Remedial Action Contract No.
        DACW4I-01-D-0001 ........................................ A-884

iv

**Page**

Government's Exhibit 25a (Excerpts) –
    Sevenson Environmental Services, Inc. Federal
    Creosote Contract Files for Phase I ................... A-888

Government's Exhibit 26a (Excerpts) –
    Sevenson Environmental Services, Inc. Federal
    Creosote Contract Files for Phase II ................. A-894

Government's Exhibit 103 –
    Bennett Environmental, Inc. Check ..................... A-921.1

Government's Exhibit 117 –
    Bennett Environmental, Inc. Request for Wire
    Transfer, dated July 21, 2003................................ A-921.2

Government's Exhibit 155 –
    Bennett Environmental, Inc. Expense Report ....... A-921.3

Government's Exhibit 159 –
    Bennett Environmental, Inc. Expense Report ....... A-921.35

Government's Exhibit 162 –
    Bennett Environmental, In781990c. Expense
    Report ................................................................. A-921.53

Government's Exhibit 213 –
    Bennett Environmental, Inc. Employee E-mails... A-922

Government's Exhibit 223 –
    Bennett Environmental, Inc. Employee E-mails A-923

Government's Exhibit 224 –
    Bennett Environmental, Inc. Employee E-mails A-926

Government's Exhibit 225 –
    Bennett Environmental, Inc. Employee E-mails A-928

Government's Exhibit 233 –
    Bennett Environmental, Inc. Employee E-mail .... A-930.1

v

Page

Government's Exhibit 247 –
    Bennett Environmental, Inc. Employee E-mails   A-931

Government's Exhibit 248 –
    Bennett Environmental, Inc. Employee E-mails   A-932

Government's Exhibit 252 –
    Bennett Environmental, Inc. Employee E-mails   A-933

Government's Exhibit 263 –
    Bennett Environmental, Inc. Employee E-mails  A-933.1

Government's Exhibit 267 –
    Bennett Environmental, Inc. Employee
    Document re: Cruise ........................................... A-934

Government's Exhibit 278 –
    Bennett Environmental, Inc. Employee E-mails   A-935

Government's Exhibit 279 –
    Bennett Environmental, Inc. Employee E-mails   A-936

Government's Exhibit 348 –
    Zul Tejpar's Original Day Planner ..................... A-938

Government's Exhibit 781a –
    Bennett Environmental, Inc. Check ................... A-940.1

Government's Exhibit 901 (Excerpts) –
    Gordon McDonald's Cingular Wireless Cell
    Phone Statements ................................................ A-941

Government's Exhibit 904 (Excerpts) –
    Rogers Communications Phone Bills for
    Bennett Environmental ...................................... A-946

Government's Exhibit 906 (Excerpts) –
    Rogers Communications Phone Bills for
    Bennett Environmental ...................................... A-951

vi

**Page**

Government's Exhibit 918 (Excerpts) –
    Group Telecom Phone Bills for Bennett
    Environmental................................................... A-956

Government's Exhibit 919 (Excerpts) –
    Group Telecom Phone Bills for Bennett
    Environmental................................................... A-961

Government's Exhibit 990 –
    F.R.E. 1006: Summary Chart of Bennett
    Environmental, Inc. Wire Transfers to GMEC .. A-965.1

Defendant's Exhibit 5005 –
    BET Letter, dated August 17, 2000.................... A-966

Defendant's Exhibit 6013 –
    E-mail, dated February 14, 2002........................ A-968

Defendant's Exhibit 6029 –
    E-mail, dated October 30, 2002 ......................... A-970

Defendant's Exhibit 6054 –
    E-mail, dated October 24, 2003 ......................... A-971

Defendant's Exhibit 6509 –
    Handwritten Notes ............................................ A-972

Defendant's Exhibit 6513 –
    Cruise Invoice .................................................. A-973

Defendant's Exhibit 6593 –
    Map .................................................................. A-973.1

Jury Verdict, dated March 16, 2016 ........................... A-974

Notice of Appeal, dated March 17, 2016 ................... A-976

Order, dated April 13, 2016 ....................................... A-977

Excerpts from the Transcript of July 20, 2016
    Proceedings............................................................ A-977.1

**vii**

|  | Page |
|---|---|
| Order, dated July 20, 2016 | A-978 |
| Excerpts from the Transcript of Sentencing Proceedings, dated August 9, 2016 | A-979 |

AO 245B (Mod. D/NJ 12/06) Sheet 1 - Judgment in a Criminal Case

# UNITED STATES DISTRICT COURT
## District of New Jersey

UNITED STATES OF AMERICA

    v.

        **CASE NUMBER    2:09-CR-00656-SDW-2**

JOHN A. BENNETT

    Defendant.

## JUDGMENT IN A CRIMINAL CASE
### (For Offenses Committed On or After November 1, 1987)

The defendant, JOHN A. BENNETT, was represented by ROBERT J. ANELLO, ESQ. (Retained).

The defendant was found guilty on count(s) 1, 2 by a jury verdict on 3/16/2016 after a plea of not guilty. Accordingly, the court has adjudicated that the defendant is guilty of the following offense(s):

| Title & Section | Nature of Offense | Date of Offense | Count Number(s) |
|---|---|---|---|
| 18:371 | KICKBACK AND FRAUD CONSPIRACY | 12/2001-8/2004 | 1 |
| 18:1031(A) | MAJOR FRAUD AGAINST U. S. | 5/15/02 | 2 |

As pronounced on August 09, 2016, the defendant is sentenced as provided in pages 2 through 7 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

It is ordered that the defendant shall pay to the United States a special assessment of $200.00 for count(s) 1, 2, which shall be due immediately. Said special assessment shall be made payable to the Clerk, U.S. District Court.

It is further ordered that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant shall notify the court and United States attorney of any material change in the defendant's economic circumstances.

Signed this  11th  day of August, 2016.

Susan D. Wigenton
U.S. District Judge

A-1

AO 245B (Mod. D/NJ 12/06) Sheet 2 - Imprisonment

Judgment - Page 2 of 7

Defendant: JOHN A. BENNETT
Case Number: 2:09-CR-00656-SDW-2

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of 63 months on each of Counts One and Two to be served concurrently.

The defendant shall remain in custody pending service of sentence.

## RETURN

I have executed this Judgment as follows:

_____

_____

_____

_____

At _____ Defendant delivered on _____ To _____

_____, with a certified copy of this Judgment.

_____
United States Marshal

By _____
Deputy Marshal

A-2

AO 245B (Mod. D/NJ 12/06) Sheet 3 - Supervised Release

Defendant: JOHN A. BENNETT                                                    Judgment - Page 3 of 7
Case Number: 2:09-CR-00656-SDW-2

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of 2 years on each of Counts One and Two to run concurrently.

Within 72 hours of release from custody of the Bureau of Prisons, the defendant shall report in person to the Probation Office in the district to which the defendant is released.

While on supervised release, the defendant shall comply with the standard conditions that have been adopted by this court as set forth below.

The defendant shall submit to one drug test within 15 days of commencement of supervised release and at least two tests thereafter as determined by the probation officer.

If this judgment imposes a fine, special assessment, costs, or restitution obligation, it shall be a condition of supervised release that the defendant pay any such fine, assessments, costs, and restitution that remains unpaid at the commencement of the term of supervised release and shall comply with the following special conditions:

NEW DEBT RESTRICTIONS

You are prohibited from incurring any new credit charges, opening additional lines of credit, or incurring any new monetary loan, obligation, or debt, by whatever name known, without the approval of the U.S. Probation Office. You shall not encumber or liquidate interest in any assets unless it is in direct service of the fine and/or restitution obligation or otherwise has the expressed approval of the Court.

**RETURN**

I have executed this Judgment as follows:

_____

_____

_____

_____

Defendant delivered on _____ To _____

At _____, with a certified copy of this Judgment.

_____
United States Marshal

By _____
Deputy Marshal

A-3

AO 245B (Mod. D/NJ 12/06) Sheet 3a - Supervised Release

Judgment - Page 4 of 7

Defendant: JOHN A. BENNETT
Case Number: 2:09-CR-00656-SDW-2

## STANDARD CONDITIONS OF SUPERVISION

While the defendant is on supervised release pursuant to this Judgment:

1)  The defendant shall not commit another federal, state, or local crime during the term of supervision.

2)  The defendant shall not illegally possess a controlled substance.

3)  If convicted of a felony offense, the defendant shall not possess a firearm or destructive device.

4)  The defendant shall not leave the judicial district without the permission of the court or probation officer.

5)  The defendant shall report to the probation officer in a manner and frequency directed by the Court or probation officer.

6)  The defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer.

7)  The defendant shall support his or her dependents and meet other family responsibilities.

8)  The defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons.

9)  The defendant shall notify the probation officer within seventy-two hours of any change in residence or employment.

10) The defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute or administer any narcotic or other controlled substance, or any paraphernalia related to such substances.

11) The defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered.

12) The defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer.

13) The defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer.

14) The defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer.

15) The defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court.

16) As directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

17) You shall cooperate in the collection of DNA as directed by the Probation Officer.

    *(This standard condition would apply when the current offense or a prior federal offense is either a felony, any offense under Chapter 109A of Title 18 (i.e., §§ 2241-2248, any crime of violence [as defined in 18 U.S.C. § 16], any attempt or conspiracy to commit the above, an offense under the Uniform Code of Military Justice for which a sentence of confinement of more than one year may be imposed, or any other offense under the Uniform Code that is comparable to a qualifying federal offense);*

18) Upon request, you shall provide the U.S. Probation Office with full disclosure of your financial records, including co-mingled income, expenses, assets and liabilities, to include yearly income tax returns. With the exception of the

A-4

AO 245B (Mod. D/NJ 12/06) Sheet 3a - Supervised Release

Judgment - Page 5 of 7

Defendant: JOHN A. BENNETT
Case Number: 2:09-CR-00656-SDW-2

financial accounts reported and noted within the presentence report, you are prohibited from maintaining and/or opening any additional individual and/or joint checking, savings, or other financial accounts, for either personal or business purposes, without the knowledge and approval of the U.S. Probation Office. You shall cooperate with the Probation Officer in the investigation of your financial dealings and shall provide truthful monthly statements of your income. You shall cooperate in the signing of any necessary authorization to release information forms permitting the U.S. Probation Office access to your financial information and records;

19) As directed by the U.S. Probation Office, you shall participate in and complete any educational, vocational, cognitive or any other enrichment program offered by the U.S. Probation Office or any outside agency or establishment while under supervision;

20) You shall not operate any motor vehicle without a valid driver's license issued by the State of New Jersey, or in the state in which you are supervised. You shall comply with all motor vehicle laws and ordinances and must report all motor vehicle infractions (including any court appearances) within 72 hours to the U.S. Probation Office;

---

*For Official Use Only - - - U.S. Probation Office*

Upon a finding of a violation of probation or supervised release, I understand that the Court may (1) revoke supervision or (2) extend the term of supervision and/or modify the conditions of supervision.

These conditions have been read to me. I fully understand the conditions, and have been provided a copy of them.

You shall carry out all rules, in addition to the above, as prescribed by the Chief U.S. Probation Officer, or any of his associate Probation Officers.

(Signed)_____

Defendant                                                    Date

_____

U.S. Probation Officer/Designated Witness                    Date

---

A-5

AO 245B (Mod. D/NJ 12/06) Sheet 5 - Fine

Judgment - Page 6 of 7

Defendant: JOHN A. BENNETT
Case Number: 2:09-CR-00656-SDW-2

**FINE**

The defendant shall pay a fine of $12,500.00.

This fine, plus any interest pursuant to 18 U.S.C. § 3612(f)(1), is due immediately. It is recommended that the defendant participate in the IFRP. If the defendant participates in the IFRP, the fine shall be paid from those funds at a rate equivalent to $25.00 every 3 months. In the event the fine is not paid prior to the commencement of supervision, the defendant shall satisfy the amount due in monthly installments of no less than $500.00 to commence 30 days after the restitution order has been satisfied.

If the fine is not paid, the court may sentence the defendant to any sentence which might have been originally imposed. See 18 U.S.C. § 3614.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) community restitution, (6) fine interest, (7) penalties, and (8) costs, including cost of prosecution and court costs.

AO 245B (Mod. D/NJ 12/06) Sheet 6 - Restitution and Forfeiture

Judgment - Page 7 of 7

Defendant: JOHN A. BENNETT
Case Number: 2:09-CR-00656-SDW-2

## RESTITUTION AND FORFEITURE

### RESTITUTION

The defendant shall make restitution in the amount of $3,808,065.72. Payments should be made payable to the **U.S. Treasury** and mailed to Clerk, U.S.D.C., 402 East State Street, Rm 2020, Trenton, New Jersey 08608, for distribution to US Environmental Protection Agency Cincinnati Finance Center, P.O. Box 979076, St. Louis MO 63197-9000.

The amounts ordered represent the total amounts due to the victims for these losses. The defendant's restitution obligations shall not be affected by any restitution payments made by other defendants in this case, except that no further payments shall be required after the sums of the amounts actually paid by all defendants has fully satisfied this loss. The following defendant(s) in the following case(s) may be subject to restitution orders to the same victims for this same loss:

| | |
|---|---|
| Robert Griffiths | 09-CR-506 |
| Gordon D. McDonald | 09-CR-656-1 |
| Zul Tejpar | 08-CR-912 |
| Bennett Environmental Inc. | 08-CR-534 |

The restitution is due immediately and shall be paid in full within 30 days of sentencing.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) community restitution, (6) fine interest, (7) penalties, and (8) costs, including cost of prosecution and court costs.

Case 2:09-cr-00656-SDW    Document 394    Filed 08/16/16    Page 1 of 1 PageID: 8699

# UNITED STATES DISTRICT COURT
for the
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Case No. 09 Cr. 656-02 (SDW) |
| | ) | |
| JOHN A. BENNETT, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## NOTICE OF APPEAL

Notice is hereby given that defendant John A. Bennett appeals to the United States Court of Appeals for the Third Circuit from the Judgment of the United States District Court, District of New Jersey, entered in this action on August 12, 2016, and from the Order of the United States District Court, District of New Jersey, entered in this action on July 20, 2016, denying Mr. Bennett's motion for an acquittal under Fed. R. Crim. P. 29 and for a new trial under Fed. R. Crim. P. 33.

Date: August 16, 2016

MORVILLO ABRAMOWITZ GRAND IASON
& ANELLO P.C.

Robert J. Anello, Esq.
Richard F. Albert, Esq.
Brian A. Jacobs, Esq.
Jacob W. Mermelstein, Esq.
Jocelyn Courtney Kaoutzanis, Esq.
Peter Janowski, Esq.
565 Fifth Avenue
New York, NY 10017
jmermelstein@maglaw.com
212-880-9445

*Attorneys for John A. Bennett*

A-8

AO245C (Mod. 0/NJ 12/06)Sheet 1 - Amended Judgment in a Criminal Case

# UNITED STATES DISTRICT COURT
## District of New Jersey

UNITED STATES OF AMERICA

v.

JOHN A. BENNETT

    Defendant.

**CASE NUMBER   2:09-CR-00656-SDW-2**

### AMENDED JUDGMENT IN A CRIMINAL CASE
### (For Offenses Committed On or After November 1, 1987)

**Date of Original Judgment:** 8/11/2016
**Reason for Amendment:** Correction of Sentence for Clerical Mistake (Fed. R. Crim. P. 36)

    The defendant, JOHN A. BENNETT, was represented by ROBERT J. ANELLO, ESQ. (Retained).

The defendant was found guilty on count(s) 1, 2 by a jury verdict on 3/16/2016 after a plea of not guilty.  Accordingly, the court has adjudicated that the defendant is guilty of the following offense(s):

| Title & Section | Nature of Offense | Date of Offense | Count Number(s) |
|---|---|---|---|
| 18:371 | KICKBACK AND FRAUD CONSPIRACY | 12/2001-8/2004 | 1 |
| 18:1031(A) | MAJOR FRAUD AGAINST U. S. | 5/15/02 | 2 |

    As pronounced on August 09, 2016, the defendant is sentenced as provided in pages 2 through 7 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

    It is ordered that the defendant shall pay to the United States a special assessment of $200.00 for count(s) 1, 2, which shall be due immediately.  Said special assessment shall be made payable to the Clerk, U.S. District Court.

    It is further ordered that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant shall notify the court and United States attorney of any material change in the defendant's economic circumstances.

    Signed this _15th_ day of August, 2016.

Susan D. Wigenton
U.S. District Judge

11232

A-9

AO 245C (Mod. 0/NJ 12/06) Sheet 2 - Imprisonment

Defendant: JOHN A. BENNETT
Case Number: 2:09-CR-00656-SDW-2

Judgment - Page 2 of 7

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of 63 months. Such term consists of 60 months on Count 1 and 63 months on Count 2 to be served concurrently for a total of 63 months.

The defendant shall remain in custody pending service of sentence.

## RETURN

I have executed this Judgment as follows:

_____

_____

_____

_____

Defendant delivered on _____ To _____

At _____, with a certified copy of this Judgment.

_____
United States Marshal

By _____
Deputy Marshal

A-10

AO 245C (Mod. 0/NJ 12/06)Sheet 3 - Supervised Release

Judgment - Page 3 of 7

Defendant: JOHN A. BENNETT
Case Number: 2:09-CR-00656-SDW-2

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of 2 years, on each of Counts 1 and 2 to run concurrently.

Within 72 hours of release from custody of the Bureau of Prisons, the defendant shall report in person to the Probation Office in the district to which the defendant is released.

While on supervised release, the defendant shall comply with the standard conditions that have been adopted by this court as set forth below.

Based on information presented, the defendant is excused from the mandatory drug testing provision, however, may be requested to submit to drug testing during the period of supervision if the probation officer determines a risk of substance abuse.

If this judgment imposes a fine, special assessment, costs, or restitution obligation, it shall be a condition of supervised release that the defendant pay any such fine, assessments, costs, and restitution that remains unpaid at the commencement of the term of supervised release and shall comply with the following special conditions:

NEW DEBT RESTRICTIONS

You are prohibited from incurring any new credit charges, opening additional lines of credit, or incurring any new monetary loan, obligation, or debt, by whatever name known, without the approval of the U.S. Probation Office. You shall not encumber or liquidate interest in any assets unless it is in direct service of the fine and/or restitution obligation or otherwise has the expressed approval of the Court.

**RETURN**

I have executed this Judgment as follows:

_____
_____
_____
_____

At _____, with a certified copy of this Judgment.
    Defendant delivered on _____ To _____

_____
United States Marshal

By _____
    Deputy Marshal

A-11

AO245C (Mod. 0/NJ 12/06)Sheet 3a - Supervised Release

Judgment - Page 4 of 7

Defendant: JOHN A. BENNETT
Case Number: 2:09-CR-00656-SDW-2

# STANDARD CONDITIONS OF SUPERVISION

While the defendant is on supervised release pursuant to this Judgment:

1) The defendant shall not commit another federal, state, or local crime during the term of supervision.

2) The defendant shall not illegally possess a controlled substance.

3) If convicted of a felony offense, the defendant shall not possess a firearm or destructive device.

4) The defendant shall not leave the judicial district without the permission of the court or probation officer.

5) The defendant shall report to the probation officer in a manner and frequency directed by the Court or probation officer.

6) The defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer.

7) The defendant shall support his or her dependents and meet other family responsibilities.

8) The defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons.

9) The defendant shall notify the probation officer within seventy-two hours of any change in residence or employment.

10) The defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute or administer any narcotic or other controlled substance, or any paraphernalia related to such substances.

11) The defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered.

12) The defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer.

13) The defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer.

14) The defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer.

15) The defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court.

16) As directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

17) You shall cooperate in the collection of DNA as directed by the Probation Officer.

   *(This standard condition would apply when the current offense or a prior federal offense is either a felony, any offense under Chapter 109A of Title 18 (i.e., §§ 2241-2248, any crime of violence [as defined in 18 U.S.C. § 16], any attempt or conspiracy to commit the above, an offense under the Uniform Code of Military Justice for which a sentence of confinement of more than one year may be imposed, or any other offense under the Uniform Code that is comparable to a qualifying federal offense);*

18) Upon request, you shall provide the U.S. Probation Office with full disclosure of your financial records, including co-mingled income, expenses, assets and liabilities, to include yearly income tax returns.  With the exception of the

A-12

AO 245C (Mod. 0/NJ 12/06) Sheet 3a - Supervised Release

Judgment - Page 5 of 7

Defendant: JOHN A. BENNETT
Case Number: 2:09-CR-00656-SDW-2

financial accounts reported and noted within the presentence report, you are prohibited from maintaining and/or opening any additional individual and/or joint checking, savings, or other financial accounts, for either personal or business purposes, without the knowledge and approval of the U.S. Probation Office. You shall cooperate with the Probation Officer in the investigation of your financial dealings and shall provide truthful monthly statements of your income.  You shall cooperate in the signing of any necessary authorization to release information forms permitting the U.S. Probation Office access to your financial information and records;

19) As directed by the U.S. Probation Office, you shall participate in and complete any educational, vocational, cognitive or any other enrichment program offered by the U.S. Probation Office or any outside agency or establishment while under supervision;

20) You shall not operate any motor vehicle without a valid driver's license issued by the State of New Jersey, or in the state in which you are supervised.  You shall comply with all motor vehicle laws and ordinances and must report all motor vehicle infractions (including any court appearances) within 72 hours to the U.S. Probation Office;

---

*For Official Use Only - - - U.S. Probation Office*

Upon a finding of a violation of probation or supervised release, I understand that the Court may (1) revoke supervision or (2) extend the term of supervision and/or modify the conditions of supervision.

These conditions have been read to me.  I fully understand the conditions, and have been provided a copy of them.

You shall carry out all rules, in addition to the above, as prescribed by the Chief U.S. Probation Officer, or any of his associate Probation Officers.

(Signed)_____

Defendant                                              Date


_____

U.S. Probation Officer/Designated Witness              Date

---

A-13

AO245C (Mod. 0/NJ 12/06)Sheet 5 - Fine

Judgment - Page 6 of 7

Defendant: JOHN A. BENNETT
Case Number: 2:09-CR-00656-SDW-2

**FINE**

The defendant shall pay a fine of $12,500.00.

This fine, plus any interest pursuant to 18 U.S.C. § 3612(f)(1), is due immediately. It is recommended that the defendant participate in the IFRP. If the defendant participates in the IFRP, the fine shall be paid from those funds at a rate equivalent to $25.00 every 3 months. In the event the fine is not paid prior to the commencement of supervision, the defendant shall satisfy the amount due in monthly installments of no less than $500.00 to commence 30 days after the restitution order has been satisfied.

If the fine is not paid, the court may sentence the defendant to any sentence which might have been originally imposed. See 18 U.S.C. § 3614.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) community restitution, (6) fine interest, (7) penalties, and (8) costs, including cost of prosecution and court costs.

AO245C (Mod. 0/NJ 12/06) Sheet 6 - Restitution and Forfeiture

Judgment - Page 7 of 7

Defendant: JOHN A. BENNETT
Case Number: 2:09-CR-00656-SDW-2

## RESTITUTION AND FORFEITURE

### RESTITUTION

The defendant shall make restitution in the amount of $3,808,065.72. Payments should be made payable to the **U.S. Treasury** and mailed to Clerk, U.S.D.C., 402 East State Street, Rm 2020, Trenton, New Jersey 08608, for distribution to US Environmental Protection Agency Cincinnati Finance Center, P.O. Box 979076, St. Louis MO 63197-9000.

The amounts ordered represent the total amounts due to the victims for these losses. The defendant's restitution obligations shall not be affected by any restitution payments made by other defendants in this case, except that no further payments shall be required after the sums of the amounts actually paid by all defendants has fully satisfied this loss. The following defendant(s) in the following case(s) may be subject to restitution orders to the same victims for this same loss:

| | |
|---|---|
| Robert Griffiths | 09-CR-506 |
| Gordon D. McDonald | 09-CR-656-1 |
| Zul Tejpar | 08-CR-912 |
| Bennett Environmental Inc. | 08-CR-534 |

The restitution is due immediately and shall be paid in full within 30 days of sentencing.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) community restitution, (6) fine interest, (7) penalties, and (8) costs, including cost of prosecution and court costs.

A-15

# UNITED STATES DISTRICT COURT
for the
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Case No. 09 Cr. 656-02 (SDW) |
| | ) | |
| JOHN A. BENNETT, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## AMENDED NOTICE OF APPEAL

Notice is hereby given that defendant John A. Bennett appeals to the United States Court of Appeals for the Third Circuit from the Amended Judgment of the United States District Court, District of New Jersey, entered in this action on August 17, 2016, and from the Order of the United States District Court, District of New Jersey, entered in this action on July 20, 2016, denying Mr. Bennett's motion for an acquittal under Fed. R. Crim. P. 29 and for a new trial under Fed. R. Crim. P. 33.

Date: August 30, 2016

MORVILLO ABRAMOWITZ GRAND IASON
& ANELLO P.C.

Robert J. Anello, Esq.
Richard F. Albert, Esq.
Brian A. Jacobs, Esq.
Jacob W. Mermelstein, Esq.
Jocelyn Courtney Kaoutzanis, Esq.
Peter Janowski, Esq.
565 Fifth Avenue
New York, NY 10017
jmermelstein@maglaw.com
212-880-9445

*Attorneys for John A. Bennett*

A-16